662 F.2d 1040
 16 ERC 1541, 12 Envtl. L. Rep. 20,113
 MONTGOMERY COUNTY, Maryland, a municipal corporation, Petitioner,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent.
State of Maryland, Department of Natural Resources, Water
Resources Administration,/P, Intervenor.
 No. 80-1782.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 6, 1981.
Decided Oct. 13, 1981.
 
 Nathan J. Greenbaum, Rockville, Md. (Paul A. McGuckian, County Atty., Robert G. Tobin, Jr., Deputy County Atty., Carole A. Jeffries, Asst. County Atty., Rockville, Md., on brief), for petitioners Montgomery County, Maryland.
 M. Brent Hare, Asst. Atty. Gen., Baltimore, Md. (Stephen H. Sachs, Atty. Gen., Thomas A. Deming, Asst. Atty. Gen., Annapolis, Md., on brief), for petitioner State of Maryland, Dept. of Natural Resources, Water Resources Administration.
 John D. Cooper, Region III, Environmental Protection Agency, Philadelphia, Pa. (Michele Biegel Corash, Gen. Counsel, EPA, Mark D. Gordon, Carol E. Dinkins, Asst. Atty. Gen., Land and Natural Resources Div.; Anthony C. Liotta, Deputy Asst. Atty. Gen., Land and Natural Resources Div.; Donald W. Stever, Jr., Raymond W. Mushal, Dept. of Justice, Washington, D. C., on brief), for respondent.
 Before BUTZNER, Circuit Judge, FIELD, Senior Circuit Judge, and RICHARD C. ERWIN, United States District Judge for the Middle District of North Carolina, sitting by designation.
 BUTZNER, Circuit Judge:
 
 
 1
 Montgomery County, Maryland,[1] petitions for review of the designation of seven drainage basins in the piedmont as an aquifer pursuant to the Safe Drinking Water Act of 1974.[2] Finding neither substantive nor procedural grounds for setting aside the action of the administrator of the Environmental Protection Agency, we dismiss the petition.
 
 
 2
 * Congress passed the Safe Drinking Water Act "to assure that water supply systems serving the public meet minimum national standards for protection of public health."[3] To safeguard underground water, Congress enacted, among other measures, § 1424(e),[4] which authorizes EPA to designate and protect from contamination aquifers that are the primary sources of drinking water in the areas they serve.[5]
 
 
 3
 Section 1448(a)(2) of the Act, 42 U.S.C. § 300j-7(a)(2), confers jurisdiction on the court of appeals for the appropriate circuit to review the administrator's action. The court must determine whether the designation of the aquifer was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and whether the administrator failed to meet statutory and procedural requirements. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); 5 U.S.C. § 706(2) (Administrative Procedure Act). To determine if an action is arbitrary or capricious, the court must consider whether the administrator's decision was "based on a consideration of the relevant factors and whether there has been a clear error of judgment." While the inquiry into the facts must be "searching and careful," the court is "not empowered to substitute its judgment for that of the agency." 401 U.S. at 416, 91 S.Ct. at 823.
 
 II
 
 4
 Two citizens' committees asked the EPA to designate an area in Montgomery County, Maryland, as an aquifer pursuant to § 1424(e) of the Act.[6] EPA officials recognized that the peculiar geological formations of the piedmont made identification of an aquifer for any given area unusually difficult. They soon concluded that a 40 square mile area proposed by the committees was not hydrogeologically defined. The administrator, therefore, asked the United States Geological Survey (USGS) to study the next larger hydrogeologic area to determine whether its designation as an aquifer could be scientifically justified. After extensive research, USGS concluded that a 130 square mile area embracing seven drainage basins was suitable.[7] After notice, comment, and a public hearing, the administrator designated the area within the boundaries of the basins as an aquifer. Based on the USGS study, the administrator also found that this aquifer was the principal source of drinking water in the area and that its contamination could pose a significant hazard to public health.[8]
 
 III
 
 5
 The county directs its principal attack against the inclusion of the seven drainage basins in the aquifer. It contends that the designation of these basins as a single aquifer was unreasonable, arbitrary, and capricious because each basin acts independently as a separate and distinct hydrogeologic unit. The county relies primarily on the USGS report, which concluded that groundwater movement in this area is generally contained within the confines of each of the individual basins. Therefore, the county argues, the area does not constitute a single aquifer because any pollution of groundwater in one basin will not contaminate groundwater in an adjacent basin.
 
 
 6
 We are not persuaded by the county's argument. Section 1424(e) was enacted to protect the nation's aquifers from contamination by federal projects, but the statute does not define the boundaries of aquifers. Because of the country's varied hydrogeological formations, Congress necessarily vested broad discretion in the administrator.
 
 
 7
 The following facts demonstrate that the administrator acted rationally within the authority conferred by the statute. All seven drainage basins comprising the aquifer have in common the original 40 square mile area that the committees sought to protect. Each of the seven basins contributes to the groundwater in the area which is the subject of the citizens' concern. Contamination in any of these seven drainage basins could contaminate this area's groundwater, even though pollution in one of the basins would not contaminate groundwater in the other six basins. Moreover, the designated aquifer incorporates the minimum number of drainage basins necessary to encompass the area. Because its boundary is the outer perimeter of the basins, it can be readily identified and mapped.
 
 
 8
 It is not enough, however, for the administrator to identify an aquifer which if contaminated would create a significant hazard to public health. By the terms of § 1424(e), the administrator must also demonstrate that the aquifer is the "sole or principal drinking water source for the area" it serves. Proposed regulations define the term "sole or principal source aquifer" as one which supplies 50% or more of the drinking water of an area.[9] Also, proposed regulations provide that the administrator must consider the availability of alternative sources of drinking water.[10]
 
 
 9
 Relying primarily on the USGS study, the administrator found that 62% of the drinking water in the area designated as the aquifer was supplied by underground sources and that there was no existing alternative source which provides 50% or more of the area's drinking water.[11] Because much of the area is rural and the groundwater furnished by numerous private wells is not metered, the USGS necessarily had to calculate what percentage of drinking water is supplied by the aquifer. It did this by applying to the estimated population served by individual and public wells an accepted rate of per capita consumption to determine total groundwater use for domestic purposes. Comparison of the total groundwater consumption with the metered water supplied by the only surface water distributor in the area established that the aquifer was "the principal drinking water source for the area," as required by § 1424(e).
 
 
 10
 The county contends that the study's calculation is flawed because USGS used 1971 and 1976 maps of the area, which are outdated, to make house counts for determining population. The study should have used, the county argues, information it supplied which was based on 1979 aerial photographs. The county also argues that the administrator erred by considering that an alternative source of water must be in existence. It asserts that the proposed regulations merely require that an alternative source of water be available for future development.
 
 
 11
 We conclude that the county's attack on the administrator's findings are unjustified. Neither census tracts nor election districts coincided with the designated area. Hence, resort to house counts on available maps was reasonable. Contrary to the county's argument, USGS did not rely simply on the house counts. It recognized that its data base was several years old, and it compensated for this by applying a reasonable growth rate which increased its estimate substantially. Furthermore, the county's calculations included as surface water users those persons who were living within 500 feet of a surface water line even though their houses were not hooked up. Obviously, the people living in these houses are using well water, and we find no caprice in the administrator's recognition of this fact.
 
 
 12
 We also conclude that the administrator did not act arbitrarily in considering that alternative sources of water must be currently available. Neither the Act nor the proposed regulations require the administrator to speculate about what alternatives to wells will be developed in the future. Although the county presented evidence that the area's surface water system would be expanded, the administrator was not barred on this account from making the designation of the aquifer. The people in the area who rely on wells are entitled to immediate protection from contamination, and they should not be denied the safeguards provided by § 1424(e) simply because surface water may become available to them in the future.
 
 
 13
 Finally, we find no procedural deficiency invalidating the administrator's action. Contrary to the county's contentions, adequate notices of all proceedings were published in the Federal Register, the administrator properly allowed the committees to amend their petitions for the designation of an aquifer, and the record, as supplemented, shows that the regional administrator complied with proposed regulation, 40 C.F.R. § 148.13, in making his recommendation.
 
 
 14
 The petition for review is dismissed.
 
 
 
 [1]
 The State of Maryland intervened generally to support the county and specifically to protest the extent of the aquifer. Because the positions of state and county are the same, we will refer to both of them as the county
 
 
 [2]
 42 U.S.C. § 300f, et seq
 
 
 [3]
 H.R.Rep.No.93-1185, 93d Cong., 2d Sess. 1, reprinted in (1974) U.S.Code Cong. & Ad.News 6454
 
 
 [4]
 Section 1424(e) of the Act, 42 U.S.C. § 300h-3(e), provides in part:
 If the Administrator determines, on his own initiative or upon petition, that an area has an aquifer which is the sole or principal drinking water source for the area and which, if contaminated, would create a significant hazard to public health, he shall publish notice of that determination in the Federal Register. After the publication of any such notice, no commitment for Federal financial assistance ... may be entered into for any project which the Administrator determines may contaminate such aquifer through a recharge zone so as to create a significant hazard to public health ....
 
 
 [5]
 Proposed EPA regulations to implement the Act define an "aquifer" as "a geological formation, group of formations, or part of a formation that contains sufficient saturated permeable material to yield significant quantities of water to wells or springs." 42 Fed.Reg. 51,622 (1977) (to be codified in 40 C.F.R. § 148.2(k))
 
 
 [6]
 The committees, concerned about a proposed landfill in their neighborhood, initially petitioned for designation of the aquifer under § 1424(a)(1), which deals with injection wells. The administrator permitted them to amend their petition and proceed under § 1424(e). Subsequently, the state denied the county a permit for the landfill
 
 
 [7]
 The basins are described in 45 Fed.Reg. 57,166 (1980)
 
 
 [8]
 See 45 Fed.Reg. 57,165-68 (1980)
 
 
 [9]
 42 Fed.Reg. 51,623 (1977) (to be codified in 40 C.F.R. § 148.2(m))
 
 
 [10]
 42 Fed.Reg. 51,623 (1977) (to be codified in 40 C.F.R. § 148.13(b)(1))
 
 
 [11]
 See 45 Fed.Reg. 57,168 (1980)