**WESTERN NEBRASKA RESOURCES COUNCIL, Petitioner,**

**v.**

**ENVIRONMENTAL PROTECTION AGENCY, Respondent.**

**No. 85–1431.**

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 12, 1985.

Decided June 6, 1986.

Andres B. Reid, Chadron, Neb., for petitioner.

Ann C. Hurley and Erik D. Olson, Washington, D.C., for respondent.

Before LAY, Chief Judge, FAGG, Circuit Judge, and ROSENBAUM,* District Judge.

FAGG, Circuit Judge.

Western Nebraska Resources Council (WNRC) has filed a petition for review before this court. That petition challenges two actions of the Environmental Protection Agency (EPA or agency) taken under authority of Part C of the Safe Drinking Water Act, 42 U.S.C. §§ 300h to 300h–4. The statutory source of this court's juris-

---

* The HONORABLE JAMES M. ROSENBAUM, United States District Judge for the District of

diction to consider WNRC's petition is found at 42 U.S.C. § 300j–7(a).

## I. Background

The Safe Drinking Water Act (SDWA or Act) identifies underground injection wells as a potential source of pollution to our nation's underground sources of drinking water (*i.e.* aquifers). To protect these sources of drinking water, Congress directed EPA to promulgate regulations governing the adoption of state-enforced underground injection control (UIC) programs. 42 U.S.C. §§ 300h(a), 300h–1. As a part of these regulations, EPA was directed to establish minimum requirements that must be adopted and implemented by all EPA approved UIC programs. *Id.* §§ 300h(b), 300h–1(b)(1)(A)(i).

EPA promulgated regulations governing state UIC programs and establishing minimum requirements for these programs in 1980. *See* 45 Fed.Reg. 33,418–513 and 45,-500–12 (1980) (presently codified as amended at 40 C.F.R. Parts 124, 144, 145, and 146). These regulations generally prohibit all new underground injection wells unless authorized by permit. *See* 40 C.F.R. § 144.31. Further, a permit may not be granted where underground injection may cause a violation of any national primary drinking regulation or may otherwise adversely affect human health. *Id.* § 144.12; *see* 42 U.S.C. § 300h(d)(2).

To further assure the protection of our nation's drinking water, the agency's UIC regulations included a broad definition of an underground source of drinking water. 45 Fed.Reg. at 33,424. That definition, as last amended in 1982, provides:

> *Underground source of drinking water (USDW)* means an aquifer or its portion:
>
> (a)(1) Which supplies any public water system; or
>
> (2) Which contains a sufficient quantity of ground water to supply a public water system; and

Minnesota, sitting by designation.

(i) Currently supplies drinking water for human consumption; or

(ii) Contains fewer than 10,000 mg/1 total dissolved solids; and

(b) Which is not an exempted aquifer.

40 C.F.R. § 144.3.

Because that definition was sufficiently broad to encompass some aquifers that will never be used as sources of drinking water, EPA, as a corollary, also adopted criteria for identifying exempted aquifers. 45 Fed. Reg. at 45,502. These criteria, last amended in 1982, provide that an aquifer (or a portion of an aquifer) may be exempted if

(a) It does not currently serve as a source of drinking water; and

(b) It cannot now and will not in the future serve as a source of drinking water because:

(1) It is mineral, hydrocarbon or geothermal energy producing, or can be demonstrated by a permit applicant as part of a permit application for a Class II or III operation to contain minerals or hydrocarbons that considering their quantity and location are expected to be commercially producible.

(2) It is situated at a depth or location which makes recovery of water for drinking water purposes economically or technologically impractical;

(3) It is so contaminated that it would be economically or technologically impractical to render that water fit for human consumption; or

(4) It is located over a Class III well mining area subject to subsidence or catastrophic collapse; or

(c) The total dissolved solids content of the ground water is more than 3,000 and less than 10,000 mg/1 and it is not reasonably expected to supply a public water system.

40 C.F.R. § 146.4. The identification of an exempt aquifer may, in certain circumstances, allow the underground injection of contaminants to be permitted where it would otherwise be prohibited.

Before underground injection will be permitted, however, the state, after notice and an opportunity for a public hearing, must itself identify and approve the aquifer exemption. _Id._ § 144.7(b)(3). That exemption (with one exception inapplicable here) must then be authorized by EPA as a revision to the state's approved UIC program. _Id._ §§ 144.7(b)(3), 145.32. Further, even after an aquifer exemption is approved by EPA, the construction and operation of any underground injection well will be subject to strict controls, _see, e.g., id._ §§ 144.21—144.70, 146.1—146.52, which will include a continuing prohibition on the movement of any contaminated fluids into nonexempt underground sources of drinking water, _see id._ § 144.12.

Once EPA had promulgated regulations governing state UIC programs, states began to submit applications to EPA seeking approval of their UIC programs. _See_ 42 U.S.C. § 300h–1(b). To gain EPA approval, a state's application must demonstrate (1) that the state has adopted and will implement a UIC program consistent with the minimum requirements established by the agency's regulations; and (2) that the state will keep such records and make such reports as may be required by the agency. _Id._ § 300h–1(b)(1)(A)(i)–(ii). After a state's UIC program application is approved by rule, _see id._ § 300h–1(b)(2), the state retains primary enforcement responsibility (primacy) until EPA by rule determines otherwise. _Id._ § 300h–1(b)(3).

In March of 1982, the State of Nebraska submitted a UIC program application to EPA. The Nebraska UIC program submitted (and as eventually approved) contained a definition of an underground source of drinking water and criteria for identifying an exempt aquifer consistent with the regulations promulgated by the agency. If anything, the state's definition of an underground source of drinking water was broader than that required by the agency, and its criteria for identifying an exempt aquifer were slightly more restrictive than the criteria adopted by the agency. _See_ 40 C.F.R. § 145.11(a).

Approximately two years later, on June 12, 1984, the agency, by publication, gave

notice of its approval of the Nebraska UIC program application. 49 Fed.Reg. 24,133 (1984). As required by 42 U.S.C. § 300h–1(b)(2), the agency's approval of that program was made by rule and is presently codified at 40 C.F.R. § 147.1401. For purposes of judicial review, the regulation approving Nebraska's UIC program (and the UIC program itself) became effective on June 26, 1984. *See* 49 Fed.Reg. at 24,133; 40 C.F.R. § 147.1401.

Prior to final approval of the Nebraska UIC program, the state, on March 28, 1984, submitted a proposed aquifer exemption to EPA for its approval. That proposed revision had not been submitted as part of Nebraska's original UIC program proposal.

At the time Nebraska sought approval of the exemption, EPA approval of the overall Nebraska UIC program was already imminent. Rather than further delay final approval of the overall Nebraska UIC program while considering the state's proposed aquifer exemption, the agency gave final approval to the Nebraska UIC program, allowing Nebraska to achieve primacy. *See* 42 U.S.C. § 300h–1(b)(3). The agency then proceeded to review the state's aquifer exemption request as a proposed revision to Nebraska's UIC program. *See* 40 C.F.R. §§ 144.7(b)(3), 145.32. Under the circumstances of this case, the agency's decision to approve the Nebraska UIC program and then consider the proposed exemption in a separate administrative action, even if reviewable, was clearly reasonable.

The aquifer exemption requested by Nebraska was for a 3,000 acre portion of an aquifer located near Crawford, Nebraska (Chadron aquifer). That exemption was intended to make possible the granting of an underground injection well permit to Wyoming Fuel Company. In turn, that permit would authorize Wyoming Fuel Company to develop underground injection wells for the subsurface mining of uranium.

After receiving Nebraska's request, EPA gave public notice of the request, accepted public comments, and on June 21, 1984, conducted a public hearing at Crawford, Nebraska. After considering all available data and taking into account all public comments, the agency approved a very small portion of the requested aquifer exemption.

Specifically, rather than approve the 3,000 acre exemption requested, the agency approved only a 6.7 acre exemption. That narrow exemption was further limited to the lower portion of the Chadron aquifer formation. The overlying formations within the 6.7 acre area were not exempted. In granting a limited aquifer exemption, essentially intended to allow the establishment of a research and development area by Wyoming Fuel Company, EPA sought to verify conclusively the validity of its determinations before approving any more extensive aquifer exemption.

EPA's approval of the limited 6.7 acre exemption was published on February 7, 1985. 50 Fed.Reg. 5253 (1985). For purposes of judicial review, the agency's decision was promulgated on February 21, 1985. *Id.*

WNRC filed its petition on April 4, 1985. WNRC challenges EPA's approval of the entire Nebraska UIC program as well as the agency's separate approval of the 6.7 acre aquifer exemption. Although related, these administrative determinations constituted separate and independent administrative actions and for purposes of judicial review must be treated as such.

II. EPA Approval of the Nebraska UIC Program

WNRC raises numerous challenges to EPA's approval of the Nebraska UIC program. In response, the agency asserts that WNRC's contentions are time barred and cannot be considered by this court. We agree.

Under the Safe Drinking Water ·Act, jurisdiction to review an EPA approved state UIC program is vested exclusively with the various circuit courts of appeal. *See* 42 U.S.C. §§ 300j–7(a)(2), 300j–8(e). Further, a petition challenging a state UIC program must be filed "within the 45-day period beginning" on the day the regulation approving the state UIC program was prom-

ulgated. *Id.* § 300j–7(a). After that period has expired, contentions that could and should have been timely raised cannot be advanced in any later civil proceeding. *Id.*

■ Quite simply, the 45–day time limit of section 300j–7(a), like those found in similar environmental statutes, defines the duration of this court's jurisdiction, and petitions filed outside the 45-day period cannot be reviewed by this court. *See Cerro Copper Products Co. v. Ruckelshaus,* 766 F.2d 1060, 1069 (7th Cir.1985) (Clean Water Act); *Eagle-Picher Industries, Inc. v. United States Environmental Protection Agency,* 759 F.2d 905, 911 (D.C.Cir. 1985) (Comprehensive Environmental Response, Compensation and Liability Act); *Trustees for Alaska v. Environmental Protection Agency,* 749 F.2d 549, 559 (9th Cir.1984) (Federal Water Pollution Control Act); *National Resources Defense Council, Inc. v. United States Environmental Protection Agency,* 673 F.2d 400, 406–07 (D.C.Cir.) (Clean Water Act), *cert. denied,* 459 U.S. 879, 103 S.Ct. 175, 74 L.Ed.2d 143 (1982); *Selco Supply Co. v. United States Environmental Protection Agency,* 632 F.2d 863, 865 (10th Cir.1980) (Federal Insecticide, Fungicide and Rodenticide Act), *cert. denied,* 450 U.S. 1030, 101 S.Ct. 1740, 68 L.Ed.2d 225 (1981); *Homestake Mining Co. v. United States Environmental Protection Agency,* 584 F.2d 862, 863 (8th Cir. 1978) (per curiam) (Federal Water Pollution Control Act); *Lloyd A. Fry Roofing Co. v. United States Environmental Protection Agency,* 554 F.2d 885, 892 (8th Cir.1977) (Clean Air Act); *Sun Enterprises, Ltd. v. Train,* 532 F.2d 280, 290–91 (2d Cir.1976) (Federal Water Pollution Control Act).

This narrow limitation is intended and in fact brings finality to the administrative process and reflects "a deliberate congressional choice to impose statutory finality on agency [action], a choice we may not second-guess." *Eagle-Picher Industries,* 759 F.2d at 911 (quoting *City of Rochester v. Bond,* 603 F.2d 927, 935 (D.C.Cir.1979)).

The only statutory exception to this express 45-day limitation is for petitions based "solely on grounds arising after the expiration of such period." 42 U.S.C. § 300j–7(a). WNRC places no reliance on that exception. Further, assuming any other exceptions to the strict 45-day limitation of section 300j–7(a) might be recognized in exceptional circumstances, no such circumstance is implicated in this case. *See Eagle-Picher Industries,* 759 F.2d at 911–12.

Here, in its June 12, 1984 approval of the Nebraska UIC program, EPA explicitly provided that for purposes of judicial review, the Nebraska UIC program would be promulgated on June 26, 1984. *See* 49 Fed.Reg. 24,133 (1984). On June 26 (as had been equally true on June 12), every procedural and substantive issue now advanced by WNRC was fully ripe and capable of judicial review. In addition, the record before the court clearly demonstrates (1) that WNRC played an active and continuing role both before and after the state's submission of its proposed UIC program; and (2) that WNRC received actual notice of the agency's approval of Nebraska's UIC program no later than July 18, 1984—over three weeks prior to the expiration of the 45-day filing period.

Despite well-defined, purely legal issues, an active role in the overall administrative process, and actual notice of the agency's approval of the Nebraska UIC program, WNRC failed to seek review of that approval until over nine months after approval was given and long after the 45-day period for review had expired. Because WNRC's petition was not timely filed, this court has no jurisdiction to review even constitutional challenges to the Nebraska UIC program. *See Lloyd A. Fry Roofing Co.,* 554 F.2d at 892. Without question, the 45-day limitation of section 300j–7(a) provided WNRC with a meaningful opportunity to seek review of the agency's action—due process requires no more. *Id.* at 892–93; *see also Natural Resources Defense Council, Inc.,* 673 F.2d at 406–07.

### III. EPA Approval of a Limited 6.7 Acre Aquifer Exemption

Before reviewing the merits of EPA's 6.7 acre aquifer exemption, we address briefly

two preliminary contentions raised by WNRC. First, WNRC argues the Safe Drinking Water Act does not authorize EPA to grant aquifer exemptions under any circumstances. In advancing that argument, WNRC attacks directly the agency's authority to promulgate regulations dealing with (1) the identification of exempt aquifers, 40 C.F.R. § 144.7(b), (2) the substantial and nonsubstantial revision of state UIC programs, *id.* § 145.32(b), and (3) the criteria to be applied in determining what may be considered an exempt aquifer, *id.* § 146.4.

WNRC's substantive challenge to the agency's regulations is untimely. At the latest, the regulations challenged by WNRC were last subject to any significant revision in 1982 or 1983. *See* 48 Fed.Reg. 14,207–08 (1983) (minor change to UIC program revision regulation); *id.* at 14,193 (minor revision to identification of exempt aquifer regulation); 47 Fed.Reg. 4998–99 (1982) (minor revision to criteria for determining exempt aquifer). As with WNRC's challenge to EPA's approval of the Nebraska UIC program, WNRC's challenge to these regulations is barred by the 45-day limitation of section 300j–7(a).

■ However, even if timely, WNRC's challenge has been raised in the wrong forum. Attacks on the agency's UIC program regulations, adopted under section 300h of the Safe Drinking Water Act, may not be brought in this court. Rather, they may be brought only in the Court of Appeals for the District of Columbia. 42 U.S.C. § 300j–7(a)(1).

■ As a second preliminary matter, WNRC challenges the authority of an acting regional administrator to approve the 6.7 acre aquifer exemption. Specifically, WNRC argues the exemption at issue constituted a "substantial" program revision that could only be approved by regulation prescribed by the EPA administrator.

As a general rule, under the Safe Drinking Water Act and the agency's UIC regulations, substantial UIC program revisions will be accompanied by rulemaking and must be approved by the EPA administrator. *See* 42 U.S.C. §§ 300h–1(b)(4), (d), 300j–9(a)(2); 40 C.F.R. § 145.32(b)(2), (4). However, under the agency's regulations, nonsubstantial program revisions need not be accomplished through formal rulemaking. *See id.* § 145.32(b)(4). Further, under certain circumstances, nonsubstantial program revisions not accomplished by rulemaking may be approved by an acting regional administrator. *See* 42 U.S.C. § 300j–9(a)(2); EPA Delegation Manual 9–[19].

In this case, in light of the state's request for a 3,000 acre aquifer exemption, the agency initially determined the requested program revision to be substantial in nature. Thus, as required by its regulations, notice of the proposed revision was given, a reasonable opportunity for public comment was provided, and a public hearing was held. *See* 40 C.F.R. § 145.32(b)(2). Not only was WNRC active in these proceedings, but the agency's actions also resulted in a complete and well-developed administrative record.

After considering all relevant information available to it and after taking into account the various comments received, EPA approved a very small portion of the requested aquifer exemption (6.7 acres). That limited approval, involving a single specific permitting request, was determined to constitute a nonsubstantial rather than a substantial program revision. Thus, formal rulemaking was determined to be unnecessary, and the acting regional administrator could approve the exemption. *See* 42 U.S.C. § 300j–9(a)(2); EPA Delegation Manual 9–[26].

■ The decision of whether a proposed UIC program revision is substantial or nonsubstantial lies with the agency. Even if reviewable, that decision, made internally and without a hearing, could be reversed only upon a showing that the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A). No such showing has been made by WNRC.

■ We turn finally to the substance of EPA's approval of the 6.7 acre aquifer exemption. WNRC's challenge to the agency's approval of that exemption was filed within the 45-day time limit of section 300j–7(a) and thus may be considered by this court.

As stated, the 6.7 acre aquifer exemption approved by the agency was a nonsubstantial program revision that could be approved without formal rulemaking. The parties agree that our review of that action is limited to determining whether the agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971); *see also Montgomery County v. United States Environmental Protection Agency,* 662 F.2d 1040, 1042 (4th Cir.1981) (applying the arbitrary and capricious test under section 300j–7 in a nonrulemaking context).

Review under the arbitrary and capricious standard is quite limited, and this court may not substitute its views for those of the agency.

> Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." In reviewing that explanation, we must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."

*Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983) (citations omitted).

We note that WNRC has made no contention that the substantial evidence test should apply in this case. *See* 5 U.S.C. § 706(2)(E). Arguably, in cases in which the program revision is made by rule after a hearing required by statute, *see* 42 U.S.C. § 300h–1(b)(4), that standard may be applicable, *see* 5 U.S.C. § 706(2)(E), and could in some cases lead to a different result. However, even if WNRC had asserted the applicability of the substantial evidence test, our thorough review of the well-developed agency record convinces us that under either standard of review no basis exists for overturning the agency's determination.

In reaching its decision, EPA properly considered a number of relevant factors. These factors included (1) whether the 6.7 acre area meets the agency's criteria for exempted aquifers, (2) the various comments received from interested groups and individuals, (3) the impact of the proposed mining project on the environment in general and on surrounding sources of drinking water in particular, (4) the impact of the proposed mining project on human health, (5) restoration of the mining site and removal of contaminants from the exempt aquifer area, and (6) reasonable alternatives to the exemption as well as alternatives to the type of mining proposed by Wyoming Fuel Company. *See generally* 50 Fed.Reg. 5253–59 (1985).

In its decision, the agency initially presented its determination that the 6.7 acre area exempted met the agency's criteria for classification as an exempt aquifer. *See* 40 C.F.R. § 146.4 (quoted *ante* at p. 196). First, after examining the data available to it, EPA found no one currently uses the 6.7 acre portion of the aquifer as a source of drinking water. In fact, the agency found that no water wells were currently located within the entire 3,000 acre area proposed by the state in its exemption request. *See* 50 Fed.Reg. at 5253–54; *see also* 40 C.F.R. § 146.4(a).

Second, the agency found the 6.7 acre area to contain uranium and found further that this uranium is expected to be producible commercially. *See* 50 Fed.Reg. at 5254; *see also* 40 C.F.R. § 146.4(b)(1). Coupled with its initial finding, this second determination was sufficient to place the 6.7 acre area within the agency's definition of an exempt aquifer. EPA, in the alternative, however, also found the 6.7 acre area to be so contaminated by uranium that it would be economically or technologically impractical to render the water in that area fit for

human consumption. *See* 50 Fed.Reg. at 5254; *see also* 40 C.F.R. § 146.4(b)(3).

On the basis of these findings, the agency concluded that the 6.7 acre area met the agency's criteria for identifying an exempt aquifer. Our review of the record convinces us that the agency's factual findings are supported by substantial evidence. Further, these findings place the 6.7 acre area within the agency's criteria for identifying an exempt aquifer, and as a result the agency's determination that the area meets these criteria is clearly reasonable.

The agency's determination that the 6.7 acre area of the Chadron aquifer met its exemption requirement did not end the agency's inquiry. Rather, as was appropriate under the circumstances, a number of other factors were considered and a number of other findings were made by EPA. First, the agency found that no significant adverse impact on human health or on the environment as a whole (including surrounding sources of water) would result from the limited 6.7 acre exemption. 50 Fed.Reg. at 5255–57. The agency also concluded that the type of mining to be made possible by the limited exemption would enhance the long-term productivity of the uranium field while not adversely affecting the long-term productivity of the area as a whole. *Id.* at 5257–58. Our review of the record again convinces us these findings, which flow from a reasoned exercise of the agency's particular expertise in the area of environmental safety, are supported by substantial evidence.

Based on these further findings, which involved those factors relevant to the agency's decision under the circumstances of this case, the agency granted a limited exemption primarily intended to allow the establishment of a research and development project. Further, as a part of its approval, the agency emphasized the exacting protective and restorative measures required to be implemented under the terms of the Wyoming Fuel Company permit. Finally, the agency emphasized that once the project was fully developed and more complete data available, a decision on any further exemption could then be made. In taking this action, the agency acted with reasoned caution and well within the scope of its permissible discretion. Thus, finding no basis on which to overturn the agency's determination, we reject WNRC's challenge to the 6.7 acre aquifer exemption.

IV. Conclusion.

WNRC's challenge to EPA's approval of the Nebraska UIC program is dismissed as untimely. Further, WNRC's challenge to certain regulations promulgated by the agency is dismissed as untimely and as brought in the wrong forum. Finally, because the agency's action was supported by substantial evidence and was neither arbitrary, capricious, an abuse of discretion, nor otherwise contrary to law, WNRC's procedural and substantive challenges to the agency's approval of the 6.7 acre aquifer exemption are rejected.