943 F.2d 867
 33 ERC 1992, 22 Envtl. L. Rep. 20,062
 WESTERN NEBRASKA RESOURCES COUNCIL, Petitioner,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent,
Ferret Exploration Company of Nebraska, Intervenor,
State of Nebraska, Department of Environmental Control, Intervenor.
 No. 90-2158.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Feb. 14, 1991.
Decided Sept. 3, 1991.
 
 Andrew B. Reid, Chadron, Neb., for appellant.
 Jon M. Lipshultz, Washington, D.C., argued (Richard B. Stewart, Jon M. Lipshultz and Randolph L. Hill, Washington, D.C., Patricia G. Miller, Kansas City, Kan., on the brief), for appellee.
 Before McMILLIAN, ARNOLD and LOKEN, Circuit Judges.
 LOKEN, Circuit Judge.
 
 
 1
 In 1983, the State of Nebraska exempted 3,000 acres of the Basal Chadron aquifer from the state's Underground Injection Control (UIC) program and petitioned the U.S. Environmental Protection Agency to approve that exemption under the Safe Drinking Water Act (SDWA), 42 U.S.C. §§ 300f et seq. The exemption was sought to permit injection-process mining of uranium ore deposits located in the aquifer. EPA approved an exemption for a 6.7 acre research and development pilot project, but held its action on the remaining acres "in abeyance." 50 Fed.Reg. 5253 (Feb. 7, 1985). Petitioner Western Nebraska Resources Council (WNRC) petitioned this court for judicial review of that limited approval order under 42 U.S.C. § 300j-7(a). We affirmed. Western Neb. Resources Council v. E.P.A., 793 F.2d 194 (8th Cir.1986) ("WNRC I ").
 
 
 2
 Following completion of the pilot project, Nebraska renewed its request for approval of the entire 3,000 acre exemption. EPA received additional public comments, held an additional informal hearing, and approved the request. 55 Fed.Reg. 21,191 (May 23, 1990). WNRC again appeals, alleging that both substantive and procedural error infected the agency's decision. We affirm.
 
 I.
 
 3
 "World class" uranium ore deposits have recently been discovered in the northwest Nebraska panhandle. An estimated 25.5 million pounds of uranium reside in the ore beneath the 3,000 acres here at issue. Ferret Exploration Company of Nebraska, Inc. (FEN), proposes to inject a leaching solution through injection wells into the ore zone, pump the dissolved uranium to the surface, extract the uranium, and then treat and reinject the water. At the conclusion of mining operations, FEN will restore the site, which includes restoring the groundwater to at least its prior quality. Assuming required approvals are granted, FEN will operate pursuant to a license issued by the U.S. Nuclear Regulatory Commission (NRC) and a permit issued by the Nebraska Department of Environmental Control (NDEC).
 
 
 4
 The SDWA, enacted in 1974 to assure safe drinking water supplies, includes provisions regulating underground injections that endanger drinking water sources. Under this portion of the statute, states may assume primary enforcement responsibility by establishing UIC programs that adopt and implement minimum federal requirements contained in EPA's SDWA regulations. See 42 U.S.C. §§ 300h, 300h-1. Nebraska's UIC program has been approved by EPA pursuant to these provisions.
 
 
 5
 The uranium ore deposits in question are located in the "basal," or lower portion of the Chadron aquifer. Because the aquifer is an underground source of drinking water as defined in the EPA regulations, FEN may not conduct the proposed injection mining until Nebraska has exempted this portion of the aquifer from its UIC program and EPA has approved that exemption as a revision to the state's program. See 40 C.F.R. §§ 144.7(b)(3) and 145.32, quoted in WNRC I, 793 F.2d at 195-196.
 
 
 6
 Nebraska exempted the entire 3,000 acres in its initial 1983 decision, but EPA only approved a 6.7 acre exemption for the pilot project in the order we affirmed in WNRC I. Therefore, after FEN completed the pilot project, Nebraska returned to EPA in 1988 for approval of the entire exemption. In the order under review, EPA granted that approval, concluding that this portion of the Chadron aquifer qualifies for exemption because (i) it "does not currently serve as a source of drinking water," 40 C.F.R. § 146.4(a), and (ii) it "cannot now and will not in the future serve as a source of drinking water because [FEN has] demonstrated [that the aquifer contains] minerals ... expected to be commercially producible," 40 C.F.R. § 146.4(b)(1). On appeal, WNRC argues that EPA's exemption regulations are invalid, that this exemption approval order is arbitrary and capricious, and that various procedural errors require reversal. FEN and NDEC have intervened in support of EPA's exemption approval.
 
 II.
 
 7
 WNRC first argues that the exemption approval is invalid because EPA lacks statutory authority to permit any contamination of underground drinking water sources. As WNRC acknowledges, this is an attack on the validity of EPA's exemption regulations, both on their face and as applied in this case. EPA responds that this attack is barred by the doctrines of res judicata and collateral estoppel because, in WNRC I, we held that WNRC's similar challenge to the regulations was time-barred under 42 U.S.C. § 300j-7(a). See 793 F.2d at 199.
 
 
 8
 We agree that WNRC I forecloses any direct challenge to the regulations under § 300j-7(a)(1), but it does not foreclose other types of challenge. Section 300j-7(a) expressly permits review of EPA's regulations, after expiration of the normal review period, "if the petition is based solely on grounds arising after the expiration of such period."[1] Moreover, the parties agree that EPA's exemption approval is an "action" subject to judicial review under § 300j-7(a)(2). Since it is therefore clear that the statute permits WNRC to attack the regulations as applied in this case, the question becomes whether WNRC may attack the validity of the regulations as well. That question is an administrative law battleground--administrative agencies in general stoutly resist those cases holding that, when an agency applies a previously adopted rule to a particular case, statutory time limits on judicial review of the rule-making do not foreclose the reviewing court from examining the statutory authority for the rule, as well as the soundness of its application to the specific situation before the court. See Texas v. United States, 749 F.2d 1144, 1146 (5th Cir.), cert. denied, 472 U.S. 1032, 105 S.Ct. 3513, 87 L.Ed.2d 642 (1985); Functional Music, Inc. v. FCC, 274 F.2d 543, 546 (D.C.Cir.1958), cert. denied, 361 U.S. 813, 80 S.Ct. 50, 4 L.Ed.2d 60 (1959).
 
 
 9
 We conclude that we need not resolve this question here because WNRC's validity argument is, in any event, patently wrong. WNRC argues that EPA, having broadly defined underground sources of drinking water in its regulations, then has no authority to permit by exemption any potential contamination of any such source. However, the statute does not expressly preclude the exemption of an aquifer that is not currently used for drinking water purposes. The key provisions of the statute speak in terms of regulation, not absolute prohibition. See 42 U.S.C. §§ 300h(b), 300h(d)(2). The principal legislative history explains that the statute was primarily aimed at controlling underground injections of waste; although Congress also intended that injection mining activities be covered, it contemplated regulation, not prohibition, because of the importance of avoiding needless interference with energy production and other commercial uses. See H.R.Rep. No. 93-1185, 93rd Cong., 2d Sess., reprinted in 4 1974 U.S.Code, Cong. & Admin.News 6454, 6480-6484.
 
 
 10
 The regulatory approach adopted here by EPA--a broad definition of covered underground waters coupled with a discretionary exemption mechanism--is a common method by which agencies preserve their discretion to regulate equitably on a case-by-case basis. Such exemption mechanisms "are inherent in the administrative process, and their unavailability under a statutory scheme should not be presumed, save in the face of the most unambiguous demonstration of congressional intent to foreclose them." Alabama Power Co. v. Costle, 636 F.2d 323, 357 (D.C.Cir.1979). We find no such foreclosure in the SDWA. Thus, EPA's exemption regulations are plainly a permissible interpretation of the statute to which we must defer. See Chemical Mfrs. Ass'n v. N.R.D.C., 470 U.S. 116, 125, 105 S.Ct. 1102, 1107, 84 L.Ed.2d 90 (1985); Chevron U.S.A. v. N.R.D.C., 467 U.S. 837, 865, 104 S.Ct. 2778, 2793, 81 L.Ed.2d 694 (1984).
 
 III.
 
 11
 WNRC argues that, even if the exemption regulations are valid, EPA's decision exempting the remaining 2993.3 acres of the Chadron aquifer from SDWA protection was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under this standard of review, we may not substitute our views for those of the agency, but we must determine whether
 
 
 12
 the agency [has] articulate[d] a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." In reviewing that explanation, we must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."
 
 
 13
 WNRC I, 793 F.2d at 200 (citation omitted).
 
 
 14
 WNRC sidesteps the crucial question, whether the record supports EPA's conclusion that this exemption satisfies the criteria in § 146.4 of the regulations. Instead, WNRC's principal complaint is that EPA "gerrymandered" the boundaries of the 3,000 acres so as to satisfy the regulations. On the one hand, it argues, the area was carefully drawn so that no present wells using the Chadron aquifer are included, which permitted the finding that the exempted portion "does not currently serve as a source of drinking water," 40 C.F.R. § 146.4(a). On the other hand, WNRC accuses EPA of arbitrarily giving FEN a "buffer zone" by including in the 3,000 acres a sizeable area outside the ore body.
 
 
 15
 Of course, EPA did not draw the boundaries of these 3,000 acres; it approved the exemption as previously granted by Nebraska. With respect to the exclusion of existing Chadron aquifer wells, we agree with EPA that this kind of "gerrymandering" is laudable as well as consistent with the regulations. As EPA stated in its order, those using water from aquifers outside the 3,000 acres "will not lose protection under the SDWA [because] migration of fluids vertically or horizontally from the [exempt] site will be in violation of the permit and the SDWA." 55 Fed.Reg. at 21,192.
 
 
 16
 As to the alleged improper expansion of the exemption area, EPA denies that has granted FEN a "buffer zone":
 
 
 17
 EPA has determined that a buffer zone is not included within the exemption boundary.... The 3000 acre area being exempted correlated directly to FEN's proposed mining activities.... The size of the exemption is based on the location of the ore zone boundaries. EPA has reviewed the information on location of the ore zone and the proposed mining activity and has determined the proposed exemption area to be appropriate for this facility.
 
 
 18
 55 Fed.Reg. at 21,194. WNRC does not argue that the expanded exemption area violates the exemption regulations; rather, WNRC simply complains that the exempted area is unnecessarily large, contrary to the statute's purpose. We disagree. Particularly because all mining activities in the exempted area will be thoroughly regulated by NRC, NDEC and EPA, we see no basis for disturbing EPA's decision that a 3,000 acre exemption was appropriate.
 
 
 19
 WNRC also challenges EPA's determination that the uranium in the exempted area is "expected to be commercially producible," 40 C.F.R. § 146.4(b)(1). WNRC asserts that the approval must be reversed because EPA accepted FEN's "speculative" economic projections and did not "adequately rework" the analysis. Although we appreciate that world uranium prices have been depressed in recent years, we find quite preposterous the notion that the estimated 25 million pounds of uranium lying beneath these 3,000 acres are not "commercially producible," at least to some extent. EPA's order confirms that it analyzed extensive current data, as well as the evidence presented in 1983, in concluding that the deposits are commercially producible. See 55 Fed.Reg. at 21,192-193. Under these circumstances, we reject WNRC's plea that this issue be returned to the agency for more study.
 
 
 20
 We also reject WNRC's contention that EPA violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4331 et seq., when it refused to prepare a formal Environmental Assessment or Environmental Impact Statement. We agree with the many circuits that have held that EPA does not need to comply with the formal requirements of NEPA in performing its environmental protection functions under "organic legislation [that] mandates specific procedures for considering the environment that are functional equivalents of the impact statement process." Alabama ex rel. Siegelman v. E.P.A., 911 F.2d 499, 504 (11th Cir.1990), and cases cited. We further agree that SDWA is such legislation, and that the procedures employed and the analysis undertaken by EPA in this proceeding covered the core NEPA concerns. Accordingly, EPA's alleged non-compliance with NEPA does not provide a basis for reversing its approval order.
 
 
 21
 To summarize, based upon an extensive administrative record, EPA has concluded that an exemption should be granted because this portion of the Chadron aquifer does not now serve as a source of drinking water and contains minerals that are expected to be commercially producible. Those findings justify the exemption under §§ 146.4(a) and 146.4(b)(1) of the agency's regulations.[2] Viewed more broadly, EPA's decision to permit the mining of extensive uranium ore deposits by means of injection technology, which will have substantially less adverse environmental effects than alternatives such as strip mining, is a permissible, and plainly reasonable, interpretation of a statute intended to protect drinking water sources while permitting energy production. That decision is supported by the record and was adequately explained by the agency. Accordingly, it was not arbitrary, capricious, an abuse of discretion, or otherwise contrary to law.
 
 IV.
 
 22
 Finally, WNRC levels a barrage of procedural objections at the EPA approval order, none of which has merit. First, WNRC argues that this decision by an EPA Regional Administrator reflects an improper delegation of the Administrator's rule-making authority. This argument borders on the frivolous. The statute expressly authorizes the Administrator to delegate any of his functions "other than prescribing regulations." 42 U.S.C. § 300j-9(a)(2). Throughout the life of this proceeding, EPA's regulations have specified that, with few exceptions not here relevant, an aquifer exemption for a "single permitting action" will be treated as a "minor exemption" that may be delegated to the agency's Regional Administrators. See 48 Fed.Reg. 40,098, 40,108 (Sept. 2, 1983). We expressly upheld this procedure in WNRC I, 793 F.2d at 199. Although WNRC argues that this subsequent order was a "major" exemption because it involved many more acres, it was still part of the same permitting action. Therefore, EPA properly followed its own procedures, which it "should be free to fashion." Vermont Yankee Nuclear Power Corp. v. N.R.D.C., 435 U.S. 519, 543, 98 S.Ct. 1197, 1211, 55 L.Ed.2d 460 (1978).
 
 
 23
 Next, WNRC argues that the EPA approval order is defective because Nebraska failed to hold additional formal hearings before renewing its request for full approval after completion of the pilot project. This argument, too, is without merit. Under the EPA regulations, Nebraska may, after notice and opportunity for public hearing, exempt additional aquifers, which EPA then treats as proposed revisions to the state's UIC program. See 40 C.F.R. § 144.7(b)(3)(i); Neb.Adm.Rules Title 122, Chapter 5.002. It is undisputed that Nebraska identified and exempted the entire 3,000 acres in 1984, after a full round of public hearings. This satisfied the procedural requirements of federal law with respect to the state's role in this process. See 40 C.F.R. § 144.7(b)(3). Therefore, whatever additional procedures the state did or did not afford at the conclusion of the pilot project[3] are irrelevant to the validity of EPA's approval order.
 
 
 24
 Similarly, WNRC argues that EPA did not subject this decision "to a proper hearing or adversary proceeding" when it held the major portion of Nebraska's application "in abeyance" after approving the 6.7 acre pilot project. This argument is foreclosed by WNRC's failure to challenge EPA's abeyance procedure in WNRC I. Moreover, the argument is unsound. EPA invited public comments and held an informal hearing at both stages of the exemption process, and WNRC participated fully at each point in the agency's proceedings. It is true, as WNRC points out, that EPA's regulations require the Administrator to either "approve or disapprove program revisions." But the regulations do not put a time limit or a procedural straightjacket on the process, and rightly so. In this case, stretching out the approval process with a pilot project to explore the effects of injection mining on the aquifer was a reasonable and prudent response to a unique situation. We conclude that EPA's procedural approach in this proceeding was fully consistent with its regulations and with the informal rule-making process that the SDWA authorizes EPA to conduct. See Phillips Pet. Co. v. E.P.A., 803 F.2d 545, 559 (10th Cir.1986).
 
 
 25
 For the foregoing reasons, we affirm.
 
 
 
 [1]
 This provision codifies the normal rule that res judicata does not bar claims based on facts not in existence at the inception of the previous suit. See, e.g., Page v. United States, 729 F.2d 818, 820 (D.C.Cir.1984)
 
 
 [2]
 EPA's evaluation of the record also "indicated" to the agency that this portion of the aquifer is presently so contaminated with radium that it would be economically impractical to develop it as a future source of drinking water. Although such a determination would provide another basis for granting the exemption, see 40 C.F.R. § 146.4(b)(3), EPA did not rely on the (b)(3) criterion for its decision. 55 Fed.Reg. at 21,193
 
 
 [3]
 We note that NDEC gave public notice and opportunity for hearing before it issued FEN a commercial mining permit in April 1990. Furthermore, NDEC will have continuing jurisdiction over the project--especially with respect to environmental concerns--because the mining permit must be renewed every five years