# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

HRI, INC.,

     Petitioner,

v.

ENVIRONMENTAL PROTECTION
AGENCY,

     Respondent.

No. 97-9556

NAVAJO NATION,

     Intervenor,

BEVERLY MARTIN,

     Amicus Curiae.

NEW MEXICO ENVIRONMENT
DEPARTMENT,

     Petitioner,

v.

UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY,

     Respondent.

No. 97-9557

NAVAJO NATION,

    Intervenor,

BEVERLY MARTIN,

    Amicus Curiae.

---

**ORDER**
Filed March 30, 2000

---

Before **EBEL**, **BRISCOE** and **LUCERO**, Circuit Judges.

---

These matters are before the court on petitioners' petitions for rehearing with suggestions for rehearing en banc. Upon review, the panel grants rehearing for the limited purpose of modifying one sentence in the court's slip opinion filed on January 6, 2000. The sentence is found on page 55 of the slip opinion and is the first sentence of the paragraph which begins "The parties do not dispute that Section 17 was purchased with funds from a 1928 Act of Congress appropriating . . . ." The sentence should be modified by adding the word "materially" before the word "dispute." The petitions are denied in all other respects.

The suggestions for rehearing en banc were transmitted to all of the judges of the court who are in regular active service as required by Fed. R. App. P. 35. As no member of the panel and no judge in regular active service on the court requested that the court be polled, the suggestions are also denied.

Entered for the Court
Patrick Fisher, Clerk of Court


By: Keith Nelson
     Deputy Clerk

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 6 2000**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

HRI, INC.,

      Petitioner,

v.

ENVIRONMENTAL PROTECTION
AGENCY,

      Respondent.

No. 97-9556

---

NAVAJO NATION,

      Intervenor,

BEVERLY MARTIN,

      Amicus Curiae.

NEW MEXICO ENVIRONMENT
DEPARTMENT,

      Petitioner,

v.

UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY,

      Respondent.

No. 97-9557

---

NAVAJO NATION,

      Intervenor,

BEVERLY MARTIN,

      Amicus Curiae.

---

**Appeal from a Decision of the United States Environmental Protection Agency**

---

Paul E. Frye, Nordhaus, Haltom, Taylor, Taradash & Frye, LLP, Albuquerque, New Mexico (Daniel I.S.J. Rey-Bear and Jill E. Grant of Nordhaus, Haltom, Taylor, Taradash & Frye, LLP  and Herb Yazzie, Attorney General, and James R. Bellis, Assistant Attorney General, Navajo Nation Department of Justice, Window Rock, Arizona, with him on the brief) for the Intervenor, Navajo Nation.

Jeptha P. Hill, Law Office of Jep Hill, Austin, Texas, for the Petitioner, HRI, Inc.

Susan M. McMichael, Special Assistant Attorney General (Carl John McKay, Assistant General Counsel, with her on the brief) Santa Fe, New Mexico, for the Petitioner, New Mexico Environment Department.

Thomas Allen Lorenzen, Environmental Defense Section, US Department of Justice (Lois J. Schiffer, Assistant Attorney General, Environment & Natural Resources Division with him on the brief), Washington, D.C., for the Respondent, Environmental Protection Agency.

Johanna Matanich and Roderick Ventura, DNA - People's Legal Services, Inc., Crownpoint, New Mexico, filed an amicus curiae brief for Beverly Martin.

––––––––––

Before **EBEL**, **BRISCOE** and **LUCERO**, Circuit Judges.

––––––––––

**LUCERO**, Circuit Judge.

––––––––––

This case involves petitions for review of actions by the United States Environmental Protection Agency ("EPA") under the Safe Drinking Water Act ("SDWA"), 42 U.S.C. §§ 300f to 300j-26. Petitioners Hydro Resources, Inc. ("HRI") and New Mexico Environment Department ("NMED") challenge EPA's decision to implement the direct federal underground injection control ("UIC") program on certain New Mexico lands, the jurisdictional status of which EPA considers disputed. Petitioner NMED challenges an additional EPA decision to implement the direct federal UIC program on adjoining lands that EPA considers Indian country under 40 C.F.R. § 144.3 and 18 U.S.C. § 1151. These petitions require us to consider several important questions, including the level of procedural formality required for EPA decisions regarding federal Indian country jurisdiction under the SDWA; the effect of state adjudications against a tribe on

EPA's authority to assess whether lands are Indian country; and the Indian country status of certain federal trust lands in the Eastern Navajo Agency. We exercise jurisdiction under 42 U.S.C. § 300j-7(a)(2), dismissing in part and remanding in part.

I

The historical and procedural background is complex and implicates issues of administrative and environmental law as well as federal Indian law. To elucidate the issues involved, we briefly relate the history of the lands in question and the procedural history of their regulation under the SDWA.

**A. Background: Sections 8 and 17 and the Eastern Navajo Agency**

HRI, a non-Indian corporation, proposes to operate a uranium mine in McKinley County, New Mexico. This mine site—the "Churchrock mine" site—is located in an area of northwestern New Mexico often known as the "checkerboard" because of its pattern of mixed Indian and non-Indian land title, originally stemming from railroad land grants. The lands at issue consist of two parcels. The first comprises approximately 160 acres located in the southeast portion of Section 8, Township 16N, Range 16W, owned by HRI in fee simple

and hereinafter referred to as the Section 8 property.[1] The United States owns the remainder of Section 8 in fee simple; the status of that land is not at issue here.

The second parcel is in Section 17, Township 16N, Range 16W, south of and contiguous to the Section 8 property. Section 17 is a split estate. The surface is owned by the United States in trust for the Navajo Nation. HRI holds the mineral rights, as well as certain surface use rights under a 1929 reservation and a 1959 Surface Owner's Agreement between the Nation and Santa Fe Pacific Railroad Company, a predecessor in interest to HRI. This agreement allows HRI to use the surface of Section 17 for mining purposes. This petition for review concerns approximately 200 acres in the northwest quadrant of Section 17—hereinafter referred to as the Section 17 property.

These lands are located in the "checkerboard" area of the Eastern Navajo Agency, within the borders of the State of New Mexico, in an area often referred to as the "EO 709/744 area" because of its establishment as an Indian reservation under two executive orders bearing those numbers. In Pittsburg & Midway Coal Co. v. Yazzie, 909 F.2d 1387, 1419-20 (10th Cir. 1990) (hereinafter Yazzie), a case involving Navajo efforts to tax a coal mine in northwestern New Mexico, we held that the reservation status of the EO 709/744 area was terminated by

---

[1] There is apparently some dispute as to the extent of the acreage owned by HRI in Section 8. Because we remand the question of Section 8 jurisdiction to EPA for further proceedings, we need not resolve the discrepancies in the delineation of that property.

executive and Congressional action. We noted that not long after Executive Orders 709 and 744 added some 1.9 million acres of land in northwestern New Mexico to the Navajo Reservation in 1907, Presidents Roosevelt and Taft issued two additional executive orders, EO 1000 in 1908 and EO 1284 in 1911, which restored unalloted lands in the EO 709/744 area to the public domain. See id. at 1391-92.[2] Concluding that the language of restoring lands to the public domain sufficed to terminate the EO 709/744 area as a reservation, see id. at 1419, we declined to declare the entire EO 709/744 area to be a de facto reservation in the face of evidence of Congressional intent to disestablish that area, see id. at 1420. We nevertheless recognized the predominantly Navajo demographic character of the area, see id. at 1419, and the complicated jurisdictional questions created by the "checkerboard" nature of land titles in the area, id. at 1421, and remanded the case to the district court to determine "to what extent the surface rights of the South McKinley Mine are held by the Navajo Tribe or by Navajo allottees." Id. at 1422.

Some of the jurisdictional questions that Yazzie left open were revisited in Pittsburg & Midway Coal Co. v. Watchman, 52 F.3d 1531 (10th Cir. 1995) (hereinafter Watchman), which reversed the district court's finding on remand

---

[2] For a thorough history of legislative and executive action pertaining to the establishment and disestablishment of reservation status for this area, see generally Yazzie, 909 F.2d at 1389-92.

that the South McKinley Mine is not Indian country under a "dependent Indian community" analysis.  See id. at 1542-45.  Relying on Supreme Court and circuit precedent recognizing dependent Indian communities both geographically very large and very small, we held that the district court erred in restricting the "community of reference" of its analysis to the mine site alone.  See id. at 1543-45.  Watchman also stated a four-part test for determining whether a given community of reference constitutes a dependent Indian community under 18 U.S.C. § 1151(b).  See id. at 1545.[3]

## B.  Statutory Framework under the SDWA

The SDWA is an environmental statute establishing overall minimum drinking water protection standards for the nation, and providing, in many instances, for delegation of specific regulation and enforcement to states and Indian tribes.  The statute directs EPA to establish minimum requirements for

---

[3] For the reasons set forth in Section IV of this decision, we need not address the precise impact of Alaska v. Native Village of Venetie Tribal Government, 522 U.S. 520, 118 S. Ct. 948 (1998) (hereinafter "Venetie"), on the holding of Watchman.  We note, however, that in Venetie, the Supreme Court reversed a decision of the Ninth Circuit applying a six-factor test—similar to our Watchman test—for dependent Indian community status to certain Alaskan Native lands.  See Venetie, 118 S. Ct. at 955 n.7.  The Court concluded that three of the factors relied on by the Ninth Circuit "were extremely far removed from the [set-aside and superintendence] requirements" of the dependent Indian community test.  Id.  These three factors—nature of the area, relationship of area inhabitants to Indian tribes and the federal government, and the degree of cohesiveness of the area and its inhabitants—comprise parts of the second and third prongs of the test adopted in Watchman, 52 F.3d at 1545, and presumably Venetie reduces substantially the weight to be afforded them.

control of underground injection processes in order to protect sources of drinking water. See 42 U.S.C. § 300h. 42 U.S.C. § 300h-1 provides for state primary enforcement of UIC programs ("primacy") upon a showing by that state that its program meets the requirements of the SDWA. For states without programs, or whose programs have been disapproved, EPA is required to prescribe federal UIC requirements. See 42 U.S.C. § 300h-1(c). In 1986, Congress added 42 U.S.C. § 300h-1(e), providing for primary UIC program enforcement responsibility by an Indian Tribe under certain circumstances. 42 U.S.C. § 300h-1(e) additionally provides that until a Tribe assumes primary responsibility, the "currently applicable underground injection control program shall continue to apply," and if such program does not exist, EPA shall prescribe one.

1.  UIC Programs: State, Federal, and Tribal

Two UIC programs are at issue in this case. One is New Mexico's program, the other EPA's program for Indian lands. EPA approved New Mexico's program for "Class III" wells, used for in situ leach uranium mining, effective August 10, 1983. See 40 C.F.R. § 147.1601. The approval of New Mexico's program specifically extended to "[certain categories of] injection wells in the State of New Mexico, except for those on Indian lands." Id.

Effective November 25, 1988, EPA approved an EPA-administered UIC program for "Indian lands in New Mexico." 40 C.F.R. § 147.1603. After

Congress in 1986 authorized EPA to treat Indian tribes as states for SDWA purposes, see 42 U.S.C. § 300h-1(e), the agency approved the Navajo Nation, in 1994, for Treatment as a State ("TAS") with respect to "all lands located within the exterior boundaries of the Navajo Reservation . . . all satellite reservations . . . and the following lands located outside the boundaries of the formal Navajo Reservation within the Eastern Navajo Agency: all Navajo tribal trust lands, all Navajo allotments, and all tribal fee lands and federal lands previously determined to be part of 'Indian country.'" (VI R. Tab 112 at 1.)  EPA did not approve the Navajo Nation's TAS application with respect to private fee lands and state trust lands within the Eastern Navajo Agency, stating that the Navajo Nation had "not demonstrated the requisite jurisdiction."  Id.  The Navajo Nation has not yet assumed primacy in SDWA enforcement for those lands for which its TAS application was approved.

In the preamble to its final rule promulgating federally administered UIC programs for, inter alia, Navajo Indian lands, EPA addressed comments regarding the agency's treatment of the jurisdictional boundaries of Indian lands.  See 53 Fed. Reg. 43096, 43097 (Oct. 25, 1988).  The preamble states in relevant part:

> [T]he definition of Indian lands adopted for the UIC program is set forth in 40 CFR 144.3.  Whatever definition is chosen, there will be disagreements about whether particular lands fall within the definition.  An Indian tribe would probably object to a State exercising jurisdiction over lands it perceives as Indian lands, and a State would object to an Indian tribe exercising authority over lands

which it believes to be non-Indian lands. Thus, disputes could prevent both the State and the Indian tribe from exercising primary enforcement responsibility for a UIC program. In order to ensure regulation of injection wells and minimize any disruption, pending the resolution of jurisdictional disputes, EPA will implement the Federal UIC program for disputed lands.

Id. To avoid undue delay in implementation of the UIC program, EPA set forth the following strategy for implementing the UIC program on disputed lands:

As described above, EPA will assume that lands described by the definition in 40 CFR 144.3 are Indian lands and will begin implementation of the UIC program on them. If disputed territory is later adjudged to be non-Indian lands, it will be deleted from the EPA Direct Implementation Indian land program and added either to the EPA (non-Indian land) DI program for that state or to the State program, as appropriate.

Id.

2.      Aquifer Exemptions

As a general rule, the SDWA prohibits contamination of an underground source of drinking water, defined broadly at 40 C.F.R. § 144.3. Because certain aquifers within that definition will never be used as sources of drinking water, however, EPA adopted criteria for exempting certain aquifers from SDWA requirements. See 40 C.F.R. § 146.4; see generally Western Nebraska Resources Council v. EPA, 793 F.2d 194, 196 (8th Cir. 1986) (hereinafter WNRC) (describing aquifer exemption process). 40 C.F.R. § 144.7(b)(3) provides that "[s]ubsequent to program approval or promulgation, the Director may, after notice and opportunity for a public hearing, identify additional exempted aquifers. . . .

- 10 -

Any disapproval by the Administrator shall state the reasons and shall constitute final Agency action for purposes of judicial review." EPA regulations specify that the identification of an aquifer as exempt, subsequent to a grant of primacy to a state or tribe, is a revision to that state or tribe's UIC program under 40 C.F.R. § 154.32. See 40 C.F.R. § 144.7(b)(4). Program revisions that EPA deems substantial must be carried out in accordance with the rulemaking process set forth in 40 C.F.R. § 145.32(b). See WNRC, 793 F.2d at 199 (concluding that approval of 6.7 acre aquifer exemption is "nonsubstantial program revision" that need not be accomplished through formal rulemaking).

The SDWA itself provides for a public hearing regarding promulgation of any rule approving, disapproving, or approving in part a state's UIC program under 42 U.S.C. § 300h-1(b)(2) or (3). See 42 U.S.C. § 300h-1(b)(4). Agency regulations also provide procedures for revision of state programs, see 40 C.F.R. § 145.32, and withdrawal of state programs, see 40 C.F.R. § 145.44.

### C. Procedural History

In 1989, NMED approved a "discharge plan" (DP-558) for underground injection by HRI on property located within Section 8, and applied for an aquifer exemption for the underlying aquifer. On June 21, 1989, EPA approved New Mexico's request for an aquifer exemption for HRI's Section 8 mine site.

In April 1992, HRI requested extension of its permit to Section 17, and

NMED applied for an additional aquifer exemption for the Section 17 property. Following a hearing and comment period, EPA issued a letter from the Director of the Water Management Division of EPA Region 6 to the Secretary of NMED, declining to approve the Section 17 aquifer exemption on the ground that Section 17 is Indian land under 40 C.F.R. § 144.3.[4]

New Mexico, however, continued to process HRI's DP-558 permit. The Navajo Nation moved to dismiss the state permit proceeding for lack of jurisdiction on the ground that Section 17 is Indian country. In mid-1994, a NMED hearing officer denied the Navajo Nation's motions and issued a proposed order, subsequently adopted by the Secretary of NMED, ruling that New Mexico had authority to regulate the Section 17 property and that Section 17 was not Indian country. The Navajo Nation appealed NMED's decision to the New Mexico Water Quality Control Commission ("WQCC"). The WQCC hearing officer dismissed the appeal as untimely.

Another state proceeding also involved the lands in question here. This proceeding is referred to as the "G-190 application," a water rights proceeding before the New Mexico State Engineer. In the G-190 application proceeding, HRI's predecessor-in-interest, the United Nuclear Corporation ("UNC"), sought a

---

[4] Although EPA Region 6 is generally responsible for supervising New Mexico's UIC program, under an internal EPA three-region agreement, EPA Region 9 is responsible for the federal UIC program for the Navajo Nation.

transfer of water rights pertaining to the Churchrock mine site. The Navajo Nation opposed the water rights application on its merits, and also objected on the ground that the State Engineer lacked jurisdiction over Sections 8 and 17 as Indian country. The State Engineer adopted a hearing officer's report finding New Mexico had jurisdiction, but denying UNC's transfer application on its merits. UNC sought review in state court, and the Navajo Nation moved to dismiss for lack of jurisdiction, based again on the Indian country issue. The state district court affirmed the State Engineer's judgment, finding insufficient water rights on the merits. Its opinion also stated, without analysis, that "[t]he mining areas in Section[s] 8 and 17 are not within the boundaries of the Navajo Nation nor are they Indian country; therefore, the water rights within them are subject to state law." (III R. Tab 67 at 1.) The Navajo Nation appealed the jurisdictional issue; UNC initially cross-appealed the ruling on the merits, then moved to dismiss its cross-appeal. The New Mexico Court of Appeals dismissed UNC's cross-appeal, and in February 1996, dismissed the Navajo Nation's appeal as moot.

In August 1995, subsequent to the 1994 NMED decision on the Section 17 amendment to DP-558, NMED again requested from EPA an extension of the Section 8 aquifer exemption to Section 17. EPA again, in a letter from Region 6 dated August 24, 1995, rejected the state aquifer exemption and stated that HRI

must obtain a federal UIC permit prior to obtaining an aquifer exemption. This letter instructed HRI and NMED that HRI should submit applications to EPA region 9 for an aquifer exemption under the federal UIC program.

Following Region 6's August 24, 1995, TAD disapproval, NMED engaged in a lengthy process with EPA Region 9 and the Navajo Nation to resolve the jurisdictional dispute through "joint permitting" of Section 17. During 1995 and 1996, representatives from EPA, NMED, and the Navajo Nation met and exchanged correspondence regarding a hybrid joint permitting scheme. These communications culminated in the EPA letter giving rise to the current dispute. This July 14, 1997, letter, sent to NMED Secretary Mark E. Widler and copied to HRI, stated EPA's position requiring federal permitting for both Section 17 and Section 8. Specifically, it notes: "EPA believes that Section 17 clearly is Indian country," but also "treat[s] the status of Section 17 as in dispute"—requiring federal permitting but not requiring NMED to concede jurisdiction. (I R. Tab 48 at 2.) Further, based on EPA's determination that "the Navajo Nation has presented substantial arguments to support its claim that Section 8 is within Indian country," the letter indicates that EPA would treat Section 8 as in dispute under the dispute rule of the Indian lands UIC rule preamble. Id. With respect to Section 8, the letter provides that "EPA has not taken a final position on the Indian country status of Section 8, only that the status is in dispute." Id. The

- 14 -

letter and a legal analysis contained in an accompanying memorandum rejected the argument that the state proceedings foreclosed EPA from acknowledging a jurisdictional dispute over the lands in question.

## II

As an initial matter, we must ascertain whether we have jurisdiction to review these EPA actions. 42 U.S.C. § 300j-7(a)(2) provides for review of any action by the Administrator of EPA under the SDWA (other than actions pertaining to the establishment of national primary drinking water standards) "in the circuit in which petitioner resides or transacts business which is directly affected by the action." Section 300j-7(a) further provides that

> [a]ny such petition shall be filed within the 45-day period beginning on the date of the promulgation of the regulation or any other final Agency action with respect to which review is sought . . . and may be filed after the expiration of such 45-day period if the petition is based solely on grounds arising after the expiration of such period.

42 U.S.C. § 300j-7(a). This 45-day period is jurisdictional, reflecting "a deliberate congressional choice to impose statutory finality on agency [action], a choice we may not second-guess." WNRC, 793 F.2d at 198 (quoting Eagle-Picher Indus., Inc. v. EPA, 759 F.2d 905, 911 (D.C. Cir. 1985)); see also Mesa Airlines v. United States, 951 F.2d 1186, 1187 (10th Cir. 1991) (stating that statutory time limit for review of administrative agency action is "jurisdictional and not discretionary").

## A.  Section 8

With respect to Section 8, the petition for review is timely.  EPA announced its decision to treat the Section 8 lands as disputed Indian country and implement the direct federal UIC program in a letter dated July 14, 1997, and the petitions for review were filed August 27, 1997.[5]

We must additionally determine, however, whether petitioners' challenge with respect to EPA's actions regarding Section 8 is ripe for purposes of judicial review.  See Mobil Exploration & Producing U.S., Inc. v. Department of Interior, 180 F.3d 1192, 1197-99 (10th Cir. 1999).  Before we can review an agency decision, we must assess "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."  Ash Creek Mining Co. v. Lujan, 934 F.2d 240, 243 (10th Cir. 1991) (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967)).  In making this determination, we look to four factors:

> (1) whether the issues in the case are purely legal; (2) whether the agency action involved is 'final agency action' within the meaning of the Administrative Procedure Act, 5 U.S.C. § 704; (3) whether the action has or will have a direct and immediate impact upon the plaintiff and (4) whether the resolution of the issues will promote effective enforcement and administration by the agency.

---

[5]  The Navajo Nation argues, in response to what it contends is an implied facial challenge to EPA's 1988 dispute rule by NMED, that such a challenge is untimely by almost a decade.  Because we do not think NMED's brief can fairly be read to raise such a facial challenge, we do not reach this claim of untimeliness.

<u>Ash Creek Mining Co.</u>, 934 F.2d at 243 (citations omitted).

As for the first factor, the questions of agency compliance with the relevant statutes and regulations and of jurisdiction under federal Indian law present purely legal issues.

The second question is whether agency action is final within the meaning of the APA. The SDWA specifically provides for review of "any other final action of the Administrator," 42 U.S.C. § 300j-7(a)(2); the pertinent question is whether EPA's July 1997 letter represents such a final action. The Supreme Court has stated that:

> As a general matter, two conditions must be satisfied for agency action to be "final": First, the action must mark the "consummation" of the agency's decisionmaking process, <u>Chicago & Southern Air Lines, Inc. v. Waterman SS Corp.</u>, 333 U.S. 103, 113 (1948)—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow," <u>Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic</u>, 400 U.S. 62, 71 (1970).

<u>Bennett v. Spear</u>, 520 U.S. 154, 177-78 (1997) (parallel citations omitted). The second <u>Bennett</u> condition is met here: Definite legal consequences flow from EPA's designation of Section 8 as disputed Indian lands for SDWA purposes, namely the requirement that HRI apply for a permit under the federal UIC program to proceed with underground injection. What the Navajo Nation contests is whether the action marks the consummation of the decision-making

- 17 -

process.[6]  See Mobil Exploration, 180 F.3d at 1197-99 (holding that "tentative or interlocutory action" does not represent "the consummation of the agency's decisionmaking process" and thus is not final agency action for APA purposes). In the July 14, 1997 letter, EPA Regional Administrator Felicia Marcus states "I want to emphasize, though, that EPA has not taken a final position on the Indian country status of Section 8, only that the status is in dispute."  (I R. Tab 48 at 2.) It is our view that EPA's designation of Section 8 as disputed Indian country is a final action—so far as it goes.  The determination that a dispute exists represents the consummation of one decision-making process, and necessarily alters legal relationships.  See Ash Creek Mining Co., 934 F.2d at 243.  Judicial evaluation of whether that determination was proper under the relevant laws and regulations will undoubtedly be of benefit to all the parties, allowing them to proceed on the proper course within the framework of the SDWA regulatory relationship.

The question of the propriety of EPA's invocation of its dispute rule, however, is a distinct one from the underlying legal matter of the Indian country status of Section 8.  EPA's July 14, 1997, letter, as well as government counsel's

---

[6] EPA itself does not specifically argue that the Section 8 decision is unripe for review, although it does refrain from taking a final position on the Indian country status of Section 8, arguing instead that it "has not had an opportunity to consider whether Section 8 is part of a 'dependent Indian community' after Venetie, and it did not develop a record below with the Venetie standard in mind," (EPA Br. at 47),  and therefore should be entitled to remand to reconsider its ruling in light of Venetie, 522 U.S. 520. Nevertheless, the threshold issue of ripeness is necessarily before us.

assertions at oral argument, indicates that the agency has not taken a final position on the underlying jurisdictional question; the agency requests instead the opportunity to develop a further administrative record in light of <u>Venetie</u>, 522 U.S. 520.  Thus, although we will address the question of whether the agency properly designated Section 8 as "in dispute" for purposes of SDWA regulation, we conclude that if such a dispute does exist, its merits are not ripe for further judicial review at this juncture.  See <u>Mobil Exploration</u>, 180 F.3d at 1197-99.

As for the additional <u>Abbott Laboratories</u> ripeness requirements, the action in this case does have a direct and immediate impact on petitioner HRI—HRI must now obtain a permit from EPA prior to commencing underground injection on Section 8.  It is less apparent whether the Section 8 action has an immediate impact on petitioner NMED.  EPA's July 14, 1997, letter refraining from taking a final position on the Section 8 jurisdictional issue does not appear to foreclose entirely some sort of joint or dual permitting scheme.  Because HRI has not sought the federal permit, we are not faced with a situation in which HRI would proceed with underground injection under a federal permit that does not satisfy the requirements of New Mexico's UIC program.  However, given that at least HRI is impacted by the decision, we need not delve further into the degree to which it impacts NMED.  Resolution of these issues would certainly promote effective enforcement and administration by the agency, and resolution of the

jurisdictional status of these lands will facilitate regulation by the appropriate authorities of underground injection activity. See Ash Creek Mining Co., 934 F.2d at 243.

Therefore, we conclude that under the APA, EPA's decision to treat Section 8 as disputed Indian country and impose federal UIC requirements is final and ripe for judicial review. The underlying question of the final Indian country status of Section 8, however, is not yet ripe for review because EPA has not completed its decision-making process with respect to that issue. See Bennett, 520 U.S. at 177-78.

**B. Section 17**

As for Section 17, respondents EPA and Navajo Nation argue that NMED's petition for review is untimely under 42 U.S.C. § 300j-7(a). We disagree. EPA's decision, contained in its letter of July 14, 1997, to treat the jurisdictional status of Section 17 as "in dispute," constitutes a revisitation of EPA's prior decision, thereby reopening the decision for review.

EPA's initial determination that Section 17 is Indian country was made in EPA Region 6's denial of NMED's request for a Section 17 aquifer exemption on November 23, 1993. According to the explicit terms of 40 C.F.R. § 144.7(b)(3), this disapproval was a reviewable final agency action for purposes of 42 U.S.C. § 300j-7(a)(2). No petition for review was filed within 45 days of that aquifer

exemption disapproval. Therefore, the instant petition for review can be timely only if it is either "based solely on grounds arising after the expiration of such period," 42 U.S.C. § 300j-7(a), or else within the 45-day period of a later and distinct final agency action, including, under certain circumstances, one reconsidering and reaffirming the initial decision. See, e.g., ICC v. Brotherhood of Locomotive Eng'rs, 482 U.S. 270, 278 (1987).

Petitioners cite to EPA Region 9's July 1997 letter as a separate and reviewable final action, citing its assertion of the dispute rule:

> Although EPA believes that Section 17 clearly is Indian country, we have also cited a second basis for EPA permitting HRI's proposed project on Section 17 under the federal SDWA—EPA's retained authority to issue permits on disputed lands. Our decision to treat the status of Section 17 as in dispute does not require NMED to concede jurisdiction, nor does it grant the Navajo Nation jurisdiction. Rather, EPA has determined only that there is a dispute such that EPA will issue the permit until the status of Section 17 is resolved.

(I R. Tab 48 at 2.) This language certainly suggests that EPA Region 9, in its July 1997 letter, reconsidered or revisited the earlier Region 6 decision to treat Section 17 as Indian country, and issued a new decision to treat it as "in dispute."[7] Yet

---

[7] Although the July 1997 letter asserts two alternative positions—that the Section 17 land is Indian country, and that it is disputed Indian country—before us EPA defends its determination that Section 17 definitively is Indian country. (EPA Br. at 41-43.) Despite the two alternative positions, and EPA's July 1997 retreat to the dispute rule from its earlier definitive assertion of jurisdiction, we conclude the July 1997 letter represents a sufficiently final agency decision to be ripe for review on its merits, see Ash Creek Mining Co., 934 F.2d at 243, particularly considering the strong effect of resolution on promoting effective enforcement and administration of the SDWA.

absent clear exercise of reconsideration authority, we look as well to the events and correspondence in the several years preceding the July 1997 letter to determine whether it represents a distinct and reviewable final agency action. While NMED argues that the relevant final action of which it seeks review, with respect to both properties at issue, is EPA's action of stating in its July 14, 1997, letter that HRI must apply for a federal UIC permit for both sections 8 and 17, this does not entirely resolve the issue. The July 1997 letter may constitute the relevant determination for purposes of timeliness, but only if we can conclude it represents new and separate decision, or a modification EPA's prior decision, and not a mere reassertion of, or refusal to reconsider, a prior decision. For the reasons set forth below, we conclude that it does constitute a new and separate decision triggering a new limitations period for petitioners to seek judicial review.

In ICC, 482 U.S. at 278, the Supreme Court, considering the reviewability of a decision by the ICC not to reopen a proceeding under its reconsideration authority pursuant to 49 U.S.C. § 10327(g), held that "[w]hen the Commission reopens a proceeding for any reason and, after reconsideration, issues a new and final order setting forth the rights and obligations of the parties, that order—even if it merely reaffirms the rights and obligations set forth in the original order—is reviewable on its merits." The Court directed that when an ICC decision is

formally characterized as one denying reconsideration, reviewing courts should not look beyond that formal characterization to determine whether reconsideration in fact occurred. See id. at 280. The situation here, however, does not involve EPA's decision to exercise or refuse to exercise an explicit statutory authority to reconsider a decision as was the case in ICC. Therefore, lacking such a formal designation—reconsideration or denial of reconsideration—we must look to the substance of EPA's action to determine whether it represents a new decision or merely a reaffirmance of previous action. Doing so, we conclude that EPA Region 9's July 14, 1997, letter examining the merits of the jurisdictional dispute over Section 17 (and Section 8) and asserting application of the dispute rule, represents a new and separate final decision on the jurisdictional status of Section 17. If EPA had simply reasserted its original position, as it did at various points in three years of correspondence with NMED, it would not have reopened its decision. EPA's detailed examination of the issue in its July 1997 letter and its affirmative assertion of the application of the dispute rule reflect a sufficient degree of separateness, novelty, and finality, to trigger the limitations period for judicial review. [8] Cf. ICC, 482 U.S. at 278; Sendra Corp. v. Magaw, 111 F.3d

_____

[8] The parties raise the issue of the "reopener doctrine," which renews the statutory time limit for judicial review in cases "where an agency has—either explicitly or implicitly—undertaken to 'reexamine its former choice.'" National Mining Ass'n v. United States Department of Interior, 70 F.3d 1345, 1351 (D.C. Cir. 1990) (quoting Public Citizen v. Nuclear Regulatory Comm'n, 901 F.2d 147, 151 (D.C. Cir. 1990)). We

(continued...)

162, 167 (D.C. Cir. 1997) ("If for any reason the agency reopens a matter and, after reconsideration, issues a new and final order, that order is reviewable on its merits, even though the agency merely reaffirms its original decision. . . . The new order is, in other words, final agency action and as such, a new right of action accrues and starts the running of a new limitations period for judicial review.") (citations omitted).[9]

---

[8](...continued)
decline to address its application here. Although the reopener doctrine is "well established" in the District of Columbia Circuit, National Ass'n of Reversionary Property Owners v. Surface Transportation Bd., 158 F.3d 135, 141 (D.C. Cir. 1998), we are not aware of its prior invocation in this Circuit. Nor are we aware of its application outside the context of formal agency rulemaking. See id. Because we conclude that EPA's informal reconsideration of its decision regarding Section 17 in the July 14, 1997, letter represents an explicit change of position, and therefore a distinct final decision reviewable on its merits, see ICC, 482 U.S. at 278, we decline to decide whether or not to adopt the "reopener doctrine" in this Circuit or determine whether it could apply in a context other than that of formal agency rulemaking.

[9] We reject petitioners' alternative argument that the state court and administrative adjudications constitute grounds arising after the expiration of the 45-day period, so as to permit an untimely petition for review. Even under the broadest possible construction of "grounds arising," the latest ruling in those cases—the New Mexico Court of Appeals' summary dismissal of the appeals of the state district court's review of the "G-190 application" proceeding—occurred on January 10, 1996, more than 45 days prior to the filing of this challenge. It is an unreasonable construction of 42 U.S.C. § 300j-7(a) to suggest that grounds arising subsequent to a final decision furnish aggrieved parties with an indefinite period of time to initiate a petition for review. Rather, grounds arising subsequent to the expiration of the initial 45-day period for review, see 42 U.S.C. § 300j-7(a), initiate an additional 45-day period. Even under the petitioners' theory that the state court adjudications required EPA, under the preamble to its rule, to reverse its determination with respect to the Section 17 land, EPA's March 4, 1996, refusal to reconsider its initial determination would necessarily serve as relevant final agency action. That decision issued more than 45 days prior to the filing of the instant petitions

(continued...)

- 24 -

EPA's reconsideration of its position on Section 17 and its articulation of alternative grounds for federal UIC implementation—namely, application of its dispute rule—are more than merely a reassertion of an earlier position. Rather, the reconsideration and articulation of alternative grounds constitute a new and distinct decision on the Section 17 issue and present sufficiently final agency action to permit judicial review pursuant to 42 U.S.C. § 300j-7(a). An assertion that the agency simply "believes" Section 17 is Indian country would appear to represent a retreat from an actual determination of its status. This conclusion is bolstered by the agency's specific statement of what it is determining: "only that there is a dispute such that EPA will issue the permit until the status of Section 17 is resolved." (I R. Tab 48 at 2.)

The conclusion that EPA's July 14, 1997, letter is a distinct final action for purposes of triggering the limitations period for judicial review is bolstered by examination of the correspondence between the parties following EPA Region 6's August 24, 1995, denial of temporary aquifer designation status for Section 17. As previously noted, that letter instructed HRI to apply to EPA Region 9, with responsibility for the Navajo Nation federal UIC program, for an aquifer exemption and discharge permit. Instead of HRI applying for a federal permit, NMED engaged in a lengthy exchange with EPA Region 9 and the Navajo Nation

---

[9](...continued)
for review.

regarding a potential "joint permitting" arrangement. Throughout that process, NMED continued to assert Section 17 was not Indian country. Yet it is unclear to what extent Region 9 and NMED considered there to be an ongoing dispute regarding Section 17's Indian country status that was awaiting determination or redetermination. In correspondence from Region 9 to NMED dated March 20, 1996, Region 9 appears to assume it was proceeding under Region 6's earlier determinations that Section 17 was Indian country. By contrast, a joint letter to HRI, sent by EPA Region 9 to NMED on June 21, 1996, but apparently never approved by NMED, proposed to admit that the parties had been "unable to resolve [their] dispute over whether EPA or NMED has permitting authority over Section 17 under the [SDWA]," to acknowledge "the potential for litigation at the end of the permitting process," and to express "confiden[ce]" that "[r]egardless of the ongoing legal dispute," a resolution could be reached. (I R. Tab 37 at 3.)

The likelihood of inter-agency cooperation decreased in late 1996 and early 1997. On February 11, 1997, Region 9 Administrator Felicia Marcus noted in a letter to NMED:

> In the last three years both EPA and NMED have held firm to our positions that each of us has exclusive authority under the [SDWA] to permit HRI's activities on Section 17. Unfortunately, we have made no real progress towards any cooperative permitting process that would enable us to overcome the jurisdictional dispute, and I am pessimistic about any future success along those lines, given the Navajo Nation's firm opposition to joint permitting and other problems . . . . Our inability to resolve the jurisdictional issue

- 26 -

appears to be impacting HRI.

(I R. Tab 44 at 1-2). Marcus then went on to propose EPA take jurisdiction over Section 17 based on the dispute rule. This resolution would "enable HRI to submit a permit application to EPA without having to wait for a legal resolution of the jurisdictional dispute." ( Id. at 2.) After NMED responded by setting forth specific statutes, regulations, and case law that it maintained supported its position, Region 9 issued its July 14, 1997, letter and an accompanying "Analysis" rejecting NMED's positions and stating unambiguously that EPA was assuming jurisdiction over both Sections 8 and 17 under the dispute rule.

When considered collectively, this correspondence indicates that Region 9 reconsidered or reexamined Region 6's Indian country determination as to Section 17. The correspondence reflects Region 9 considered there to be an ongoing dispute that could be resolved notwithstanding Region 6's prior determinations. Significantly, both NMED and HRI expressly considered that litigation of Region 9's decision was possible, perhaps even likely.

EPA reasons that, because it never wavered from Region 6's initial determination that Section 17 was Indian country, the July 1997 letter and analysis cannot give rise to an independently reviewable determination. In its July 1997 letter and accompanying analysis, however, Region 9 did not merely reiterate what Region 6 had previously stated; nor did it issue a cursory

reaffirmance or summary of Region 6's prior position; it examined for the first time the legal precedent offered by NMED and HRI, analyzed that precedent in light of the particular factual scenario at hand, and reasoned from its understanding of the facts and law that Section 17 was Indian country. A large portion of Region 9's July 1997 Analysis was devoted to discussing and distinguishing Yazzie, 909 F.2d 1387, and Watchman, 52 F.3d 1531, neither of which EPA had addressed before, and the latter of which arose after Region 6's initial 1993 TAD decision. In short, Region 9's July 14, 1997, determination marked the only time EPA forthrightly examined all interested parties' competing positions and issued an opinion analyzing the issue in significant depth. It was the culmination of what can be characterized either as Region 9's independent determination regarding the Indian country status of Section 17, or as Region 9's reexamination of Section 17's status (as determined by Region 6) at NMED's request. Because NMED petitioned for judicial review within 45 days of Region 9's July 14, 1997, letter and Analysis, this court has jurisdiction to review EPA's determination that Section 17 is Indian country.

## III

Now that we have established our jurisdiction to review these agency determinations, we ask did EPA's actions violate the SDWA or EPA regulations. We conclude they did not.

Under the APA, a court can set aside informal agency decisions, such as those before us, if the decisions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(a). We owe some degree of deference, under certain circumstances, to an agency's interpretation of its governing statutes and regulations. See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984). While petitioners argue that EPA's determinations with respect to issues of Indian jurisdiction are entitled to no deference because they are matters outside the agency's expertise, such an argument cannot successfully extend to the agency's interpretation of its own procedural requirements.[10] Interpretation of the procedural regulations pertaining to the grant, modification, and withdrawal of primacy and to the grant, denial, or revocation of aquifer exemptions are matters within the agency's expertise, and entitled to deference under Chevron, 467 U.S. at 842-43. Chevron requires that we ask "whether the agency's answer is based on a permissible construction of the statute" when Congress has not "directly spoken to the precise question at issue." Id. Because Congress has delegated authority to EPA to implement the SDWA, see 42 U.S.C. §§ 300f, 300g-1, we

_____

[10] While petitioners suggest that EPA's interpretation of 18 U.S.C. § 1151 is not entitled to any deference because Congress has not delegated interpretive power to EPA with respect to that statute, see Chevron, 467 U.S. at 844, we need not resolve that issue, because of our conclusion, see infra Section IV.A, that EPA's decision regarding the Indian country status of Section 17 is correct even absent any deference.

- 29 -

apply Chevron deference to the agency's construction of those procedural requirements of its implementation left unspecified by Congress.

In addition to this deference to an agency's construction of statutes, we also owe deference to its construction of its own regulations. "[P]rovided an agency's interpretation of its own regulations does not violate the Constitution or a federal statute, it must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" Stinson v. United States, 508 U.S. 36, 45 (1993) (quoting Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945)). If EPA's action represents a direct violation of statutory terms that are not ambiguous, the action is of course "not in accordance with the law" and entitled to no deference. See Chevron, 406 U.S. at 842-43; Mission Group Kansas v. Riley, 146 F.3d 775, 780 (10th Cir. 1997).

## A. Section 8

HRI argues that EPA's assertion of federal UIC jurisdiction over Section 8 directly violates the SDWA's provision: "[U]ntil an Indian Tribe assumes primary enforcement responsibility, the currently applicable underground injection control program shall continue to apply." 42 U.S.C. § 300h-1(e). Because EPA recognized New Mexico's jurisdiction over Section 8 by granting the 1989 aquifer exemption, petitioners argue, New Mexico's is the "currently

applicable" UIC program, and thus should continue to apply until a tribe assumes primary responsibility.

Such an analysis mischaracterizes the scope of EPA's authority under the SDWA. EPA does not have the power to change the Indian country status of land—that is a status conferred by Congress. If Section 8 is indeed Indian country, then New Mexico's program could not extend to it in the first instance and cannot be "currently applicable" within the meaning of the statute. An aquifer exemption by EPA cannot change the congressionally-defined jurisdictional status of the land. If the land in question is Indian country, the "currently applicable" program must necessarily be governed by the federal Indian lands UIC regulations, 40 C.F.R. Pt. 147, subpart HHH. See 40 C.F.R. § 147.3000(a) ("The UIC program for the Indian lands of the Navajo . . . in New Mexico is administered by EPA"). Accordingly, we reject this argument as a basis for reversal of EPA's decision requiring HRI to seek a federal SDWA permit for Section 8.

42 U.S.C. § 300h-1(b)(3) provides that after approval of a state UIC program, "the State shall have primary enforcement responsibility for underground water sources until such time as the Administrator determines, by rule, that such State no longer meets the requirements of clause (i) or (ii) of paragraph (1)(A) of this subsection." HRI contends that the 1989 approval of a

program amendment to include the Section 8 aquifer exemption determined conclusively that Section 8 is under New Mexico primacy, and therefore EPA cannot unilaterally amend or withdraw that primacy determination without making a determination of noncompliance pursuant to 42 U.S.C. § 300h-1(b)(3). We disagree that 42 U.S.C. § 300h-1(b)(3) controls. A more reasonable reading of subsection (b)(3), viewed in the context of the entire SDWA scheme of delegated regulation and enforcement, limits its application to those instances in which EPA disapproves an entire previously approved state UIC program or substantive elements thereof. EPA's decision at issue does not revoke New Mexico's "primary enforcement responsibility for underground water sources" as contemplated by 42 U.S.C. § 300h-1(b)(3). Rather, it simply determines that certain lands are outside the reach of New Mexico's program as previously approved by 40 C.F.R. § 147.1601, pursuant to 42 U.S.C. § 300h-1(b).

Review of the regulations implementing the SDWA helps to elucidate the appropriate circumstances for application of the procedures required by 42 U.S.C. § 300h-1(b)(3). 40 C.F.R. § 145.34 procedurally provides for when a state, either on its own initiative, see § 145.34(a), or on the initiative of EPA Administrator, see § 145.34(b), is relieved of its responsibilities under the SDWA.[11] For such a

---

[11] 40 C.F.R. § 145.34, titled "Procedures for withdrawal of State programs," provides, in relevant part, as follows:
  (a) A State with a program approved under this part may voluntarily

(continued...)

- 32 -

substantial transfer of enforcement authority, § 145.34 understandably requires extensive notice and hearing requirements, particularly so in the case of an involuntary withdrawal, in which case the State is afforded the opportunity to remedy instances of noncompliance. See § 145.34(b)(1). The rulemaking requirements of 42 U.S.C. § 300h-1(b)(3) are directed at regulating the significant act of finding a state program substantively defective, with its accompanying requirements of opportunity to cure defects and provision for orderly transfer. Although it seems apparent that the precise circumstances of this case were not explicitly contemplated by Congress in enacting the SDWA or by the agency in promulgating the procedural regulations thereunder, our consideration of the purpose and particular requirements of 40 C.F.R. §§ 145.32 and 145.34, persuades us that the regulations pertaining to program revision, see 40 C.F.R. § 145.32, are more appropriately applicable to the action before us for review.

We do not accept the "tail wags the dog" argument that a relatively small jurisdictional reassessment of certain geographic areas amounts to a determination

[11](...continued)
transfer program responsibilities required by Federal law to EPA by taking the following actions, or in such other manner as may be agreed upon with the Administrator.

\* \* \*

(b) Approval of a State UIC program may be withdrawn and a Federal program established in its place when the Administrator determines, after holding a public hearing, that the State program is not in compliance with the requirements of SDWA and this part.

that a state's UIC program no longer meets SDWA requirements, invoking the procedures established by 42 U.S.C. § 300h-1(b)(3) and 40 C.F.R. § 145.34(b). Instead of constituting a withdrawal of a state program, see 40 C.F.R. § 145.34, EPA's assertion of permitting jurisdiction over Sections 8 and 17 is better characterized as a state program revision appropriately controlled by the procedures set forth in 40 C.F.R. § 145.32(b)(4). See WNRC, 793 F.2d at 199 ("under the agency's regulations, nonsubstantial program revisions need not be accomplished through formal rulemaking"). Therefore, EPA's action did not violate 42 U.S.C. § 300h-1.

40 C.F.R. § 145.32 allows for "program revision[s]," at the initiative of either the approved State or EPA. See § 145.32(a) ("Either EPA or the approved State may initiate program revision"). Given our conclusion that EPA's action is not contrary to statute, and that the agency regulatory procedures for program revision are a proper exercise of delegated authority under the statute, we analyze EPA's interpretation of its regulations under the Chevron framework. See Mission Group Kansas, 146 F.3d at 780-81. Under that standard, we conclude that EPA reasonably asserted jurisdiction as an EPA-initiated program revision pursuant to 40 C.F.R. § 145.32(a).

The propriety of this revision turns on whether it is a "substantial" revision, requiring adherence to the particular notice and comment requirements of 40

- 34 -

C.F.R. § 145.32(b)(2)—requirements that even EPA does not contend were met. Section 145.32 provides that "[w]henever EPA determines that the proposed program revision is substantial, EPA shall issue public notice and provide an opportunity to comment for a period of at least 30 days." 40 C.F.R. § 145.32(b)(2). The regulation further requires that "[n]otice of approval of any substantial revision shall be published in the FEDERAL REGISTER. Notice of approval of non-substantial program revisions may be given by a letter from the Administrator to the State Governor or his designee." 40 C.F.R. § 145.32(b)(4). The tentative revocation of the Section 8 aquifer exemption, affecting some 160 acres, is reasonably construed as a "nonsubstantial program revision." WNRC, 793 F.2d at 199.[12] Therefore, we find no procedural violation in the EPA's assertion of jurisdiction.

## B. Section 17

As for Section 17, we similarly conclude that because EPA's denial of an aquifer exemption and assertion of federal jurisdiction under the dispute rule does not represent a program withdrawal, it does not implicate the procedural requirements of 40 C.F.R. § 145.32. EPA's initial action as to Section 17

---

[12] WNRC, 793 F.2d at 198-201, the only published case to address directly appropriate procedural requirements for substantial and non-substantial aquifer exemptions under the SDWA and its regulations, approved EPA's determination that a 3,000 acre aquifer exemption request constituted substantial revision, but a 6.7 acre exemption constituted nonsubstantial revision.

represented a disapproval of a request for an additional aquifer exemption under 40 C.F.R. § 144.7(b)(3), which provides only that such disapproval "shall state the reasons and shall constitute final Agency action for purposes of judicial review." EPA's initial letter of disapproval states the jurisdictional grounds for that action, and thereby satisfies the procedural requirements of § 144.7(b)(3). Likewise, its July 1997 letter states in considerable detail the reasons for its assertion of jurisdiction under the dispute rule and substantive federal Indian law. As we noted with respect to Section 8, assertion of federal jurisdiction over an area of land encompassing some 200 acres is reasonably construed as a nonsubstantial program revision for purposes of 40 C.F.R. § 145.32(b)(4), and we find no violation of procedural law or regulation. Whether EPA's substantive decision regarding Section 17 represents an abuse of discretion or decision contrary to law is a question we confront below.

**IV**

We now consider whether EPA's decision to assert SDWA jurisdiction over Sections 8 and 17 constitutes an action contrary to law or an abuse of discretion by EPA in light of the state adjudications discussed in Section I.C, supra, and prior EPA actions. Petitioners claim that EPA, by subjecting Sections 8 and 17 to the direct federal implementation UIC program, violated the terms of the

preamble to its Indian lands UIC regulations[13] because that land was "later adjudged" to be non-Indian land.  53 F.R. 43,096, 43,097.  Petitioners additionally argue that the collateral estoppel effects of the previous state adjudications foreclose the Navajo Nation from asserting that the lands in question are Indian country.  Although EPA, which was not party to these adjudications, is not directly bound under the law of collateral estoppel, petitioners assert that EPA is obligated to regard these adjudications as binding under the "later adjudged" language of its dispute rule and thus required to remove the lands from the federal UIC program.[14]  53 Fed. Reg. at 43,097.

---

[13]  Although petitioners do not explicitly raise a facial challenge to the dispute rule, their suggestions of its illegitimacy run contrary to the established canon of statutory construction requiring that "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit."  Montana v. Blackfeet Tribe, 471 U.S. 759, 766 (1985).  We also note that "[w]hile language in the preamble of a regulation is not controlling over the language of the regulation itself . . . the preamble to a regulation is evidence of an agency's contemporaneous understanding of its proposed rules," and therefore provides guidance in evaluating whether the agency's interpretation of its regulation is consistent with the structure and language of the rule.  Wyoming Outdoor Council v. United States Forest Service, 165 F.3d 43, 53 (D.C. Cir. 1999).

[14]  Petitioner HRI contends that the full faith and credit statute, 28 U.S.C. § 1738, precludes EPA from reaching a decision contrary to the state adjudications.  Section 1738, however, provides only that state court decisions "shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State . . . from which they are taken."  Under New Mexico law, it is well established that one prerequisite to the application of the doctrine of collateral estoppel is that "the party to be estopped was a party to the prior proceeding."  Shovelin v. Central New Mexico Elec. Coop., Inc., 850 P.2d 996, 1000 (N.M. 1993).  It is undisputed that EPA was not a party to the prior proceedings; thus, under New Mexico law of collateral estoppel, it is not bound by those proceedings.

Because EPA was not a party to those adjudications, and because EPA, as an agency of the federal government, has an independent duty to protect Indian interests, we conclude that the agency did not err in finding, despite the state adjudications, a legitimate dispute as to the jurisdictional status of the lands in question.[15]

The federal government bears a special trust obligation to protect the interests of Indian tribes, including protecting tribal property and jurisdiction. See, e.g., Oneida County v. Oneida Indian Nation, 470 U.S. 226, 247 (1985) (holding that "[t]he canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians"); Morton v. Mancari, 417 U.S. 535, 555 (1974) (recognizing "Congress' unique obligation toward the Indians); United States v. Creek Nation, 295 U.S. 103, 109-10 (1935) (holding that the federal executive is held to a strict fiduciary standard in relations with Indian tribes and is to take "all appropriate measures for protecting

---

[15] The Navajo Nation claims that the doctrine of collateral estoppel does not apply to these adjudications because the adjudications failed to constitute a full and fair opportunity to be heard. We need not reach that issue of New Mexico state law because of our conclusion, predicated upon the federal trust obligation to protect the Indian nations' interests and interpret ambiguities in favor of Indians, that EPA's interpretation of its dispute rule is a permissible one. Even if the Navajo Nation were be bound by the adjudications under New Mexico law—an issue we explicitly do not reach today—we conclude that, under the "later adjudged" language of the preamble, EPA did not violate either its own regulations in placing Section 8 in the federal UIC program or in declining to remove Section 17 therefrom, because EPA was justified in interpreting the preamble's language as requiring that an adjudication be binding upon the United States for the adjudication to resolve conclusively a jurisdictional dispute.

and advancing" those tribes' interests).  Felix Cohen's <u>Handbook</u> summarizes the

impact of this relationship on agency action:

> [T]he federal trust responsibility imposes strict fiduciary standards
> on the conduct of executive agencies — unless, of course, Congress
> has expressly authorized a deviation from these standards in exercise
> of its "plenary" power.  Since the trust obligations are binding on the
> United States, these standards of conduct would seem to govern all
> executive departments that may deal with Indians, not just those such
> as the Bureau of Indian Affairs which have special statutory
> responsibilities for Indian affairs.  Moreover, in some contexts the
> fiduciary obligations of the United States mandate that special regard
> be given to the procedural rights of Indians by federal administrative
> agencies.

Felix S. Cohen, Handbook of Federal Indian Law at 225 (footnotes omitted) (1982

ed.); <u>see also</u> <u>Montana v. Blackfeet Tribe</u>, 471 U.S. 759, 766 (1985) (discussing

canon of statutory construction, derived from the trust relationship, requiring

construction of statutes liberally in favor of Indians and resolution of ambiguities

in their favor).  The trust relationship and its application to all federal agencies

that may deal with Indians necessarily requires the application of a similar canon

of construction to the interpretation of federal regulations.

Additional Supreme Court cases emphasize a particular federal duty to

safeguard Indian interests in land.  <u>See</u> <u>Drummond v. United States</u>, 324 U.S. 316,

318 (1945) (holding that suits by the United States to protect Indian land interests

are not barred by prior adjudications against individual Indians); <u>United States v.</u>

<u>Candelaria</u>, 271 U.S. 432, 444 (1926) (same).  Considering this duty, and the

broad definition of Indian country in both 18 U.S.C. § 1151 and the SDWA regulations, as well as the complicated jurisdictional history of many Indian lands, we conclude that it is reasonable for EPA to adopt an interpretation of its regulations requiring, when lands are in dispute, presumptions in favor of Indian country status and resulting federal jurisdiction. Moreover, considering the trust duty, we hold it is permissible for EPA—at least under circumstances such as these, involving adjudications ultimately resolved not on the merits but on procedural grounds, and implicating pure issues of federal Indian law—to decline to consider as "adjudged" lands as to which the agency was not a party to the relevant proceedings.

The fundamental constitutional principles supporting independent federal inquiry into the title status of Indian land apply with even greater force to disputes over Indian country jurisdictional status. Jurisdictional status of land implicates not only ownership, but also the core sovereignty interests of Indian tribes and the federal government in exercising civil and criminal authority over tribal territory.

EPA's assumption that the land was not Indian country, when it previously granted an aquifer exemption for Section 8, can neither change the congressionally-determined status of that land, nor deprive the federal government of its duty and prerogative to protect Navajo governance of Indian

lands.  In considering the Indian country status of certain Creek nation lands in Oklahoma, we stated: "[T]he past failure to challenge Oklahoma's jurisdiction over Creek Nation lands, or to treat them as reservation lands, does not divest the federal government of its exclusive authority over relations with the Creek nation or negate Congress's intent to protect Creek tribal lands and Creek governance with respect to those lands."  Indian Country U.S.A., Inc. v. Oklahoma, 829 F.2d 967, 974 (10th Cir. 1987) (citing United States v. John, 437 U.S. 634, 652-53 (1978)).  Congress's intent to protect tribal lands and governance extends no less to EPA than to other departments of the federal government, and therefore, in accordance with Indian Country, U.S.A., the agency's interpretation of its rule to permit recognition of a dispute under the circumstances of this case is clearly permissible.

Our recent decision in Osage Tribal Council v. Department of Labor, 187 F.3d 1174 (10th Cir. 1999), is not to the contrary.  In Osage Tribal Council, 187 F.3d at 1183-84, we rejected an argument that the Secretary of Labor violated his trust responsibility to the Osage Tribe by initiating a proceeding under the employee protection provisions of the SDWA.  The facts of that case involved the termination of an environmental inspector employed by the Tribal Council to monitor its compliance with SDWA provisions.  See id. at 1178.  When the inspector was terminated, allegedly for filing environmental violation reports

protected under the SDWA, the Secretary brought a proceeding under 42 U.S.C. § 300j-9(i), and an Administrative Law Judge found in favor of the inspector. See id. The Tribal Council appealed, alleging in part that "in bringing [the] action, the Secretary of Labor . . . violated the federal government's trust responsibility toward the tribe." Id. at 1183 (citing Creek Nation, 295 U.S. at 109; Cohen, supra, at 226). We restated the trust doctrine, but concluded that the Tribal Council had not demonstrated a breach of the Secretary's "strict fiduciary standards when charged with administering Indian lands or funds" because "rather the Secretary was carrying out his duties with respect to Congress' mandate on safe drinking water." Id. at 1183-84 (citations omitted).

In Osage Tribal Council, the Secretary of Labor was in no way administering Indian lands. In this case, by contrast, EPA's decision, while made within the framework of administering the SDWA, implicates the core federal trust responsibilities of administering—and safeguarding—Indian lands. While there is no allegation before us of a breach of a specific statutory, treaty, or trust obligation, we nevertheless reaffirm that the federal executive is to consider its strict fiduciary obligation when interpreting regulations that directly affect its "administ[ration of] Indian lands." Id. at 1183 (citing Morton v. Ruiz, 415 U.S. 199, 236 (1974); Seminole Nation v. United States, 316 U.S. 286, 296 (1942)). The trust duty is not relevant to the decision at issue in Osage Tribal Council:

- 43 -

whether or not to enforce the employee protection provisions of the SDWA against a tribe pursuant to Congress's unequivocal mandate that those provisions apply to tribes. See id. at 1180-83. It is most relevant, however, when an agency decision necessarily incorporates a determination as to whether certain lands are within the scope of tribal territorial sovereignty. See, e.g., United States v. Santa Fe Pac. R.R. Co., 314 U.S. 339, 353-54 (1941) (applying principle of "solicitude of the Federal government" for Indian welfare and principle of resolving ambiguities in favor of Indians to question of tribal jurisdiction over land). Thus, this case is entirely unlike the decision in Osage Tribal Council, which implicated a clear congressional mandate regarding enforcement of SDWA whistleblower provisions against Indian Tribes, but did not implicate decisions defining the extent of Indian territorial sovereignty. The fact that the trust doctrine does not bar whistleblower suits against a tribe that happen to arise under the SDWA, see Osage Tribal Council, 187 F.3d at 1183-84, does not create a per se prohibition against application of the doctrine to government agencies whenever the SDWA happens to be involved, and certainly not when tribal lands and tribal territorial sovereignty are directly involved.

Also unlike Osage Tribal Council, this case does not reflect an assertion of an affirmative cause of action based on an official's alleged violation of a trust duty. Rather, that duty and its accompanying canon of construction simply

- 44 -

provide additional support for EPA's interpretation of its regulation: That the agency, in the course of SDWA adjudication, may make an independent evaluation, based on federal law, of the Indian country status of disputed lands. The fact that EPA is not specifically charged with administration of Indian lands or funds does not render unreasonable its solicitude for core Indian interests. Our conclusion that there is no right of action under the trust duty to contest the Secretary of Labor's enforcement of a clear congressional mandate to apply a statutory rule to Indian tribes, see id., does not obviate application of the canon of construing ambiguities to favor Indian interests to executive officials when their actions necessarily implicate determinations of the extent of tribal sovereignty.

Petitioners argument—that EPA's rejection of the Navajo Nation's TAS application as to private fee lands in the Eastern Navajo Agency forecloses EPA's assertion that a dispute exists as to jurisdiction over Section 8—is without merit. EPA's September 20, 1994, partial approval of the Navajo Nation's TAS application states that "the Navajo nation has not satisfied the third criterion . . . under section 1451 of the SDWA for federal land and tribal fee lands (except for the lands in these categories that have already been determined to be part of 'Indian country'), private fee lands, and New Mexico state trust lands within the Eastern Navajo Agency." (VI R. Tab 112 at 25). EPA explicitly declined to find

that the Navajo Nation has no jurisdiction over federal lands, some tribal fee lands, private fee lands, and New Mexico state trust lands:

> It is important to note what determination EPA is and is not making in this case at this time. For those categories of lands for which EPA cannot determine whether the Navajo Nation has jurisdiction, EPA is simply stating that the Navajo Nation has not adequately shown that it does have jurisdiction. However, EPA is not determining that the Navajo Nation does not have jurisdiction. Neither is EPA determining whether or not such lands are "Indian lands" for the purposes of EPA's UIC program in New Mexico.

Id. at 20. By its own terms, EPA's 1994 TAS decision took no position on the "Indian lands" status of such lands, and therefore its decisions later with respect to Sections 8 and 17 cannot be characterized as impermissible collateral attacks on its 1994 TAS decision.

For these reasons, we decide that EPA is not foreclosed by the state adjudications or by its earlier actions in the TAS proceeding from finding a legitimate dispute as to the Indian country status of the lands at issue, and therefore EPA did not violate the terms of its dispute rule, either in declining to remove Section 17 from the federal UIC program or in placing Section 8 into that program as disputed Indian country.

**V**

EPA regulations define "Indian lands" for the purpose of the SDWA as "'Indian country' as defined in 18 U.S.C. 1151." 40 C.F.R. § 144.3. 18 U.S.C. § 1151 defines Indian country as:

> (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

Petitioners assert that even if EPA's actions were procedurally correct under the SDWA, the agency erred in its substantive decisions, pursuant to § 1151, regarding the Indian country status of the lands in question. We thus review whether EPA erred in finding a legitimate dispute as to the Indian country status of Section 8 and in finding Section 17 to be Indian country.

## A. Section 8

EPA does not argue that the Section 8 property is conclusively Indian country; rather, it requests the opportunity to reach a final decision as to whether the Section 8 land constitutes a "dependent Indian community" under 18 U.S.C. § 1151(b), following the Supreme Court's intervening clarification of the standards therefor in Alaska v. Native Village of Venetie Tribal Gov't, 522 U.S. 520, 118 S. Ct. 948 (1998). While Venetie does not foreclose EPA's application

of its dispute rule, the ultimate merits of that dispute are not ripe for resolution. See supra Section II.A.

Petitioners tell us that even if the designation of Section 8 as "in dispute" did not violate the SDWA, its interpreting regulations, and the federal full faith and credit statute, EPA's decision is invalid because no legitimate dispute can exist as to Section 8, which is conclusively non-Indian country. Although we do not determine definitively whether Section 8 is Indian country because the question is not ripe for judicial review, we conclude that there is a legitimate dispute, following Venetie, as to whether Section 8 falls within a "dependent Indian community" under 18 U.S.C. § 1151(b). See United States v. Roberts, 185 F.3d 1125, 1133 (10th Cir. 1999) (noting that, after Venetie, "the relationship between informal reservations and dependent Indian communities is not entirely clear under current case law"). Specifically, there are grounds for dispute as to the first branch of the Watchman test for 18 U.S.C. § 1151(b): What constitutes the proper "community of reference" in determining the Indian country status of Section 8? Watchman, 52 F.3d at 1542-43; accord United States v. Adair, 111 F.3d 770, 774-75 (10th Cir. 1997). Because we lack a decision below on the appropriate community of reference, see Watchman, 52 F.3d at 1542-43 (remanding community of reference question for lower court determination), and on the application of the set-aside and superintendence tests required by Venetie,

118 S. Ct. at 955, for 18 U.S.C. § 1151(b), we are not in an appropriate position to resolve the dispute itself at this time.

Although it appears that, in disapproving of the Ninth Circuit's multi-factor test for identifying a dependent Indian community, Venetie, 118 S. Ct. at 955 n.7, may require some modification of the emphases in the second step of our dependent Indian community test in Watchman, 52 F.3d at 1545, nothing in Venetie speaks to the propriety of the first element of that test—determination of the proper community of reference. See Venetie, 118 S. Ct. at 955 & n.7. Watchman, 52 F.3d at 1542-43, explicitly declined to define with precision the proper community of reference for another mine site within the EO 709/744 area. Instead, it simply rejected the district court's restriction of that community of reference to the mine site alone. See id. Presumably because of the categorical effect of the Alaska Native Claims Settlement Act ("ANCSA") on virtually all Alaskan native lands, the Supreme Court in Venetie was not even presented with the question of defining the proper means of determining a community of reference for analysis under § 1151(b). See Venetie, 118 S. Ct. at 955-56 (noting that ANCSA "revoked the Venetie Reservation along with every other reservation in Alaska but one, see 43 U.S.C. § 1618(a), and Congress stated explicitly that ANCSA's settlement provisions were intended to avoid a 'lengthy wardship or trusteeship.' § 1601(b)").

- 49 -

Because Venetie does not speak directly to the issue, barring en banc review by this court, Watchman, 52 F.3d at 1542-45, continues to require a "community of reference" analysis prior to determining whether land qualifies as a dependent Indian community under the set-aside and supervision requirements of 18 U.S.C. § 1151(b). Cf. United States v. Mazurie, 419 U.S. 544, 549-51 (1975) (analyzing the entirety of the Fort Washakie, Wyoming area, not only the Blue Bull Bar itself, to determine whether the bar is within a "non-Indian community" within the meaning of 18 U.S.C. § 1154). Under at least one theory—that the community of reference in the current action is the entire Churchrock Chapter, a theory neither adopted nor rejected in Watchman—Section 8 might qualify as a dependent Indian community. See Watchman, 52 F.3d at 1545 (declining to resolve whether the entire Tsayatoh Chapter is the appropriate community of reference for the South McKinley Mine site). Therefore, we cannot conclude that EPA abused its discretion in concluding that a dispute exists as to the Indian country jurisdictional status of Section 8. As discussed in Section II.A, supra, the merits of that dispute are not currently ripe for review.

We are mindful of petitioners' concern over the delay this jurisdictional dispute has caused in HRI's plans for mining operations, and of their concern that remanding to the agency for a final decision on the jurisdictional dispute may further delay the ultimate resolution of the jurisdictional question. We note,

however, that HRI has long had, and declined to exercise, the option of applying for a permit under the federal direct implementation UIC program, and that its choice not to do so undermines the force of these temporal concerns.

## B.  Section 17

Section 17 is Indian country pursuant to 18 U.S.C. § 1151(a).  Under Supreme Court and Tenth Circuit precedent, trust lands such as the Section 17 property are Indian country.  See Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe, 498 U.S. 505, 511 (1991); Roberts, 185 F.3d at 1131 (holding that "official 'reservation' status is not dispositive and lands owned by the federal government in trust for Indian tribes are Indian country pursuant to [18] U.S.C. § 1151").

The definitions of Indian country in § 1151 derive from several Supreme Court decisions from the first half of this century.  See United States v. McGowan, 302 U.S. 535 (1938); United States v. Pelican, 232 U.S. 442 (1914); United States v. Sandoval, 231 U.S. 28 (1913); see also Venetie, 118 S. Ct. at 953-55 (discussing codification in 18 U.S.C. § 1151 of doctrines of Sandoval, Pelican, and McGowan).  Those cases and their progeny instruct that the test for whether land qualifies as Indian country by virtue of its status as a reservation or dependent Indian community is twofold: whether land has been validly set aside by the federal government for the use of Indians; and whether that land is subject

to federal supervision.  See Venetie, 118 S. Ct. at 954; Potawatomi, 498 U.S. at 511; McGowan, 302 U.S. at 539.

We have interpreted Supreme Court precedent as establishing that formal designation as a reservation is not a necessary precondition for land to qualify as Indian country under § 1151(a).  See Roberts, 185 F.3d at 1131.  The Court has held that its cases

> make clear that a tribal member need not live on a formal reservation to be outside the State's taxing jurisdiction; it is enough that the member live in 'Indian Country.'  Congress has defined Indian country broadly to include formal and informal reservations, dependent Indian communities, and Indian allotments, whether restricted or held in trust by the United States.

Oklahoma Tax Comm'n v. Sac & Fox Nation, 508 U.S. 114, 123 (1993) (hereinafter Sac and Fox).  The Court's clarification of the test for dependent Indian communities under § 1151(b) does not alter the broad definition of "reservation" for Indian country purposes in Sac & Fox, 508 U.S. at 123.  See Venetie, 118 S. Ct. at 954-55 (discussing requirements for "dependent Indian community" status).  Accordingly, our recognition in Yazzie, 909 F.2d 1387, that the Eastern Navajo Agency had been terminated as a formal reservation does prevent lands within the EO 709/744 area from qualifying under § 1151(a) as "informal reservations," Sac & Fox, 508 U.S. at 123, provided they meet the appropriate conditions.  Yazzie, 909 F.2d at 1422, stands for the proposition that land is not necessarily Indian country under § 1151(a) simply by virtue of being

within the boundaries of the EO 709/744 area.  To qualify as Indian country, it must satisfy one of the tests of 18 U.S.C. § 1151.  See Mustang Prod. Co. v. Harrison, 94 F.3d 1382, 1384 (10th Cir. 1996) (holding that "disestablishment of the reservation is not dispositive of the question of tribal jurisdiction.  In order to determine whether the Tribes have jurisdiction we must instead look to whether the land in question is Indian country") (internal quotations and citation omitted).

In support of the proposition that Section 17 does not constitute Indian country, petitioners point to our statements in Yazzie that "[a]lthough subsection 1151(a) clarifies that checkerboard titles within an existing reservation do not affect the status of an Indian reservation as reservation, subsections 1151(b) and (c) allow checkerboard jurisdiction outside reservation boundaries," and that "the land is not Indian reservation, although presumably much of it is Indian country." Yazzie, 909 F.2d at 1422.  That language, however, does not amount to a holding that subsection 1151(a) informal reservation land cannot exist within the EO 709/744 area, particularly so considering the Supreme Court's subsequent explicit holding in Potawatomi, 498 U.S. at 511, that trust land outside a formally designated reservation can qualify as a reservation for tribal immunity purposes. Yazzie and Watchman are more properly read to stand for the proposition that land does not acquire reservation status simply by virtue of its being within the EO 709/744 area, absent other evidence of congressional set-aside and

- 53 -

supervision. <u>Venetie</u>, 118 S. Ct. at 953-54, teaches that there is little difference in substance between the tests under § 1151(a) and § 1151(b), emphasizing the focus on set-aside and supervision for a dependent Indian community just as for a reservation. <u>See also</u> <u>Sac & Fox</u>, 508 U.S. at 123 (stating that "Congress has defined Indian country broadly to include formal and informal reservations, dependent Indian communities, and Indian allotments, whether restricted or held in trust by the United States"); <u>Roberts</u>, 185 F.3d at 1130-33 (recognizing informal reservations).

Understandably, <u>Watchman</u> did not address the issue of whether land held in trust by the federal government for a tribe could constitute Indian country under § 1151(a) even outside the established reservation boundaries, because the mine site at issue in that case involved no such trust land. <u>See</u> <u>Watchman</u>, 52 F.3d at 1534 (discussing surface ownership interests in mine site, which included land held in trust by the United States for individual Navajo allottees, but not for the Navajo Nation). Therefore, it cannot foreclose the conclusion required by the controlling cases of <u>Potawatomi</u> and <u>Roberts</u>.

Because we decide that <u>Yazzie</u> and <u>Watchman</u> do not foreclose the existence of Indian country within the EO 709/744 area, we must look to the facts of federal action with respect to Section 17 to assess whether it qualifies as Indian country in the form of an informal reservation under subsection 1151(a) or

dependent Indian community under subsection 1151(b). Cf. Roberts, 185 F.3d at 1133 (holding that tribal trust land qualifies as Indian country under set-aside and superintendence tests, without resolving the question of whether it is to be categorized under § 1151(a) or § 1151(b)). In sum, under relevant Supreme Court and circuit precedent, Section 17 is Indian country pursuant to 18 U.S.C. § 1151(a).

1.      Set-aside

In assessing the Indian jurisdictional status of Section 17, we look first to whether it was set aside by the federal government. The initial history of the surrounding area is set forth in detail in Yazzie, and we need not discuss it in depth here. What is particularly pertinent to the set-aside inquiry is congressional action following the termination of the EO 709/744 area as a reservation.

We have held that "for purposes of defining Indian country, the term simply refers to those lands which Congress intended to reserve for a tribe and over which Congress intended primary jurisdiction to rest in the federal and tribal governments. . . . A formal designation of Indian lands as a 'reservation' is not required for them to have Indian country status." Indian Country U.S.A., 829 F.2d at 973 (citing McGowan, 302 U.S. at 538-39). Moreover, "tribal lands, trust lands, and certain allotted lands generally remain Indian country despite disestablishment." Id. at 975 n.3. In McGowan, 302 U.S. at 537-39 & n.4, the

Court held that land purchased under congressional appropriation of funds for the purpose of "procuring home and farm sites, with adequate water rights" and "[f]or the purchase of land and water rights" for Indians was validly set aside for purposes of the Indian country determination.

The parties do not materially dispute that Section 17 was purchased with funds from a 1928 Act of Congress appropriating:

> [f]or purchase of additional land and water rights for the use and benefit of Indians of the Navajo Tribe (at a total cost not to exceed $1,200,000, which is hereby authorized), title to which shall be taken in the name of the United States in trust for the Navajo Tribe, fiscal years 1928 and 1929, payable . . . .: *Provided*, that in purchasing such land title may be taken, in the discretion of the Secretary of the Interior, for the surface only.

Act of May 29, 1928, ch. 853, 45 Stat. 883, 899-900 ("1928 Act").

"[S]ection seventeen, containing six hundred forty acres" of "Township sixteen north, range sixteen west" of the New Mexico Meridian was conveyed by the Santa Fe Pacific Railroad Company to "the UNITED STATES OF AMERICA, IN TRUST FOR THE NAVAJO TRIBE," on June 14, 1929. (III R. Tab 65, Ex. K, at 1-3.) This conveyance was subject to a reservation, to the Santa Fe Railroad, of "all oil, gas, coal and minerals" as well as "the right to prospect for, mine and remove the same and to use so much of the surface of said lands as shall be necessary" for mining purposes. (Id. at 5.) The congressional directive to purchase railroad lands for the benefit of the Navajo is sufficiently clear so that,

once because it is evident that the lands in question were purchased under that congressional appropriation and are held in trust for the Navajo, the lands satisfy the set-aside element of the Indian country test. See McGowan, 302 U.S. at 537-39.

NMED's argument that Yazzie, 909 F.2d at 1418, forecloses the possibility that the 1928 appropriation could create de facto reservation lands within the EO 709/744 area misreads our decision in Yazzie. NMED quotes language in Yazzie to the effect that "congressional appropriations for water development on the Pueblo Bonito 'Reservation' or 'subdivision of the Navajo Reservation' in the years from 1919 to 1927 do not show that Congress recognized the 709/744 area in New Mexico as maintaining reservation status." Id. The quoted language, however, dealt with our rejection of the Navajo Nation's argument that the appropriations at issue implicitly reversed the 1908-1911 disestablishment of the EO 709/744 reservation in its entirety. It is another question altogether whether a subsequent 1928 statute demonstrates an intent to set aside some limited portion of those lands for the use and benefit of the Navajo. It is inconsistent with our precedent to say that the conclusion that the 709/744 area was disestablished as reservation forecloses the possibility of Indian country existing within that area. See Yazzie, 909 F.2d at 1421-22[16]; see also Watchman, 52 F.3d at 1542-44

_____

[16] In Yazzie, we noted the "fact that the 709/744 area in New Mexico remains

(continued...)

- 57 -

(concluding that trust allotments are Indian country under § 1151(c) and indicating that non-reservation land could constitute Indian country under the "dependent Indian community" analysis of § 1151(b)). In rejecting arguments that a "tribal convenience store should be held subject to state tax laws because it does not operate on a formally designated 'reservation,' but on land held in trust for the Potawatomis," Potawatomi, 498 U.S. at 511, recognized that subsection 1151(a) allows Indian country jurisdiction outside reservation boundaries. See also Roberts, 185 F.3d at 1133 (holding that Venetie is not a "repudiation of the Court's prior discussions of 'informal' reservations").[17]

The 1928 Act, which specifies only a lump sum of money and not particular lands to be purchased, is nevertheless sufficient to establish congressional intent

---

[16](...continued)
checkerboarded Indian country in a way that may complicate jurisdictional questions in civil cases such as this one creates an issue for examination on remand. . . . It is well to remember that Congress has authorized checkerboard jurisdiction under its definition of Indian country in 18 U.S.C. § 1151. Although subsection 1151(a) clarifies that checkerboard titles within an existing reservation do not affect the status of an Indian reservation as reservation, subsections 1151(b) and (c) allow checkerboard jurisdiction outside reservation boundaries."

[17] While Potawatomi dealt with whether the trust land at issue was validly set apart for Indian use in the context of determining tribal sovereign immunity, and the case before us involves the definition of Indian country under 18 U.S.C. § 1151, we can see no meaningful difference between the necessary inquiry in those two contexts. In assessing both § 1151 jurisdiction and sovereign immunity, the Potawatomi court adopted the precise inquiry it had framed in an earlier case dealing with § 1151: "whether the area has been 'validly set apart for the use of the Indians as such, under the superintendence of the Government.'" Potawatomi, 498 U.S. at 511 (quoting John, 437 U.S. at 648-49) (sovereign immunity inquiry); cf. John, 437 U.S. at 648-49 (§ 1151 inquiry).

to set aside lands purchased thereunder, including Section 17, for the Navajo. We do not believe that Congress's plenary power over Indian affairs, see Morton, 417 U.S. at 551-52, is so limited that it is unable to set aside lands for Indians without specifying the precise lands in question. See McGowan, 302 U.S. at 537-39. If congressional intent to set aside land and water for Indian use is otherwise evident, as we conclude it is here, we can see no reason for a judicially-imposed rule that would prohibit Congress from delegating to the Secretary of the Interior discretion to select, within specified limits, the particular lands to be purchased. See Roberts, 185 F.3d at 1133-35. The language of the 1928 Act appears remarkably similar to that of the 1916 Act at issue in McGowan, which the Supreme Court found indicative of congressional intent to set aside some 20 acres of land in the Reno Indian Colony as a dependent Indian community. See McGowan, 302 U.S. at 537 & n.4 (quoting Act of May 18, 1916, ch. 125, 39 Stat. 123, 143, as authorizing "[f]or the purpose of procuring home and farm sites, with adequate water rights . . . for the non-reservation Indians in the State of Nevada, $15,000"). Because of the similar language of the 1928 Act, see 45 Stat. at 899-900, McGowan controls the set-aside aspect of the Indian country test for Section 17, and Yazzie does not foreclose the existence of subsection 1151(a) Indian country in the relevant area.

2.  Federal Supervision

The second element of the test for Indian country is federal supervision.

We have before us uncontested evidence in the record that the Section 17 land is

supervised by the Bureau of Indian Affairs in the same manner as lands within the

formal Navajo reservation.  The Affidavit of Genevieve Denetsone, Area Realty

Officer, Navajo Area Office, BIA, provides with respect to Section 17 that:

> [t]he Bureau of Indian Affairs (BIA) actively oversees and regulates
> the acquisition and use of interests in and the use of the trust
> property described as Section 17, T16N, R16W, N.M.P.M., as
> required by federal law.  The BIA provides the same federal
> oversight and applies the same statutory and regulatory requirements
> concerning the acquisition of interests in Section 17 as it does to
> analogous land within the formal 1880 reservation boundaries.

(IV R. Tab 88 Ex. C at 2.)  This degree of supervision is closely analogous to the

degree we found sufficient for the Indian country test in Roberts, 185 F.3d at

1135 (finding federal supervision of trust property where United States retains

title, continues to oversee the property, and treats it as trust property) and

substantially greater than the minimal degree we held insufficient in Buzzard v.

Oklahoma Tax Comm'n, 992 F.2d 1073, 1076-77 (10th Cir. 1993).

The degree of federal supervision of the Section 17 land is entirely unlike

the minimal supervision of Alaskan native lands that the Supreme Court rejected

as insufficient in Venetie, 118 S. Ct. at 956.  Following enactment of the ANCSA,

"federal protection of the [Alaskan native] land is essentially limited to a

statutory declaration that the land is exempt from adverse possession claims, real property taxes, and certain judgments as long as it has not been sold, leased, or developed." Id. The Court distinguished this minimal level of superintendence from the "active control" present in McGowan, 302 U.S. at 537-39 (emphasizing that the federal government had retained title to the land to protect Indians), Pelican, 232 U.S. at 447 (finding supervision of allotments where the lands were "under the jurisdiction and control of Congress"), and Sandoval, 231 U.S. at 37 n.1 (citing statute placing Pueblo land under the "absolute jurisdiction and control" of Congress). Venetie, 118 S. Ct. at 956. The Venetie Court rejected the government's provision of social programs as merely general federal aid, and not indicia of active federal control. See id. Here, by contrast, the federal government directly retains title to the land in question, and exercises federal control over the acquisition of interests not only in the land itself but also in its use, just as it does for formal reservation land. (IV R. Tab 88 Ex. C at 2); see also Roberts, 185 F.3d at 1135. This is analogous to the situation in Roberts and entirely unlike the virtually complete divestiture of federal control found under the ANCSA. Cf. Buzzard, 992 F.2d at 1076-77 (holding that mere restraint on alienation is insufficient federal superintendence to confer federal jurisdiction under Indian country statute).

The split nature of the surface and mineral estates does not alter the jurisdictional status of these lands for SDWA purposes. In promulgating its regulations for the Indian lands UIC program, EPA specified that "[i]f ownership of mineral rights and the surface estate is split, and either is considered Indian lands, the Federal EPA will regulate the well under the Indian land program." 53 Fed. Reg. at 43,098. This is not an unreasonable interpretation of the SDWA, considering the federal government's role in protecting Indian interests and the relationship of mining and underground injection to Indian communities and their public water supplies. Furthermore, with respect to Section 17, the 1928 Act specifically provided that "in purchasing such lands title may be taken, in the discretion of the Secretary of the Interior, for the surface only." Ch. 853, 45 Stat. at 899-900. We simply do not see how this language, which provides for the possibility of split estates, undermines the essential aim of the relevant appropriation: "[f]or purchase of additional land and water rights for the use and benefit of Indians of the Navajo Tribe." Id.

As we stated in Cheyenne-Arapaho Tribes v. Oklahoma, 618 F.2d 665, 668 (10th Cir. 1980), we remain "convinced that, barring possible specific exceptions to which our attention is not directed, lands held in trust by the United States for the Tribes are Indian Country within the meaning of § 1151(a)." See also

<u>Roberts</u>, 185 F.3d at 1131. Petitioners have not cited, and we do not identify, any exceptions to this rule pertinent to these lands.

Thus, under <u>Sac & Fox</u>, <u>Potawatomi</u>, and <u>Venetie</u>, we conclude that Section 17 is Indian country under 18 U.S.C. § 1151(a). Section 17 might qualify as Indian country under 18 U.S.C. § 1151(b) as well. However, a dependent Indian community analysis would require us to delve into potentially difficult questions regarding the impact of <u>Venetie</u> on the <u>Watchman</u> analysis—questions that we are not required to reach today in light of the clear Indian country status of the land in question under 18 U.S.C. § 1151(a). <u>See</u> <u>John</u>, 437 U.S. at 648 n.17 (declining to consider grounds for federal jurisdiction under § 1151(b) and (c) after finding jurisdiction under § 1151(a)).

## VI

EPA did not exceed its statutory authority or abuse its discretion in determining that the Section 17 lands constitute Indian country and the Section 8 lands are subject to a jurisdictional dispute requiring implementation of the direct federal UIC program under the SDWA. The petitions for review are thus **DISMISSED**; the Section 8 issue is hereby **REMANDED** to EPA for a final determination as to whether that land is a dependent Indian community under 18 U.S.C. § 1151(b).[18]

---

[18] Petitioners' motions to file addenda to their briefs are **GRANTED**;

(continued...)

---

[18](...continued)

Respondents' motions to strike briefs are **DENIED**.